

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED FIRE AND CASUALTY
COMPANY (Individually and as
Assignee and Subrogee of GREAT
SOUTH TIMBER & LUMBER, LLC),

       Plaintiff,                        Case No.: 6:19-cv-1049-CEM-EJK

v.

PROGRESSIVE EXPRESS  INSURANCE
COMPANY,

       Defendant.

_____/

## AFFIDAVIT OF WILLIAM D. HAGER

The undersigned Affiant, having been duly sworn, deposes and states as follows:

1.  My name is William D. Hager.  I am over the age of 18 years and have personal knowledge of the facts stated herein.

2.  I have been retained as an expert witness in this case by the law firm Neilson & Associates, P.A. on behalf of the Plaintiff, Untied Fire & Casualty Company (hereinafter "UNITED FIRE"), in the above-styled lawsuit.

3.  My opinions are based on my skill, knowledge, training, education, expertise, and experience, which are detailed in my attached Curriculum Vitae, identified as Appendix A to my attached report of July 1, 2020, a copy of which is attached as Exhibit A.

4.  My opinions that are contained within the attached Exhibit A are incorporated herein.

5.  This Affidavit pertains to the bad faith conduct of PROGRESSIVE EXPRESS INSURANCE COMPANY (hereinafter "PROGRESSIVE"), and the claims of PIERCE

AND LOIS MILLS (hereinafter "MILLS") arising out of their motor vehicle accident on November 13, 2013, in Columbia County, Florida, hereinafter referred to as the "accident."

6. On November 13, 2013, MILLS were traveling on a public road, in their designated lane of travel after dark and within the applicable speed limit. A tractor trailer attempted to make a left hand turn across their lane of travel in the dark and violated their right of way causing a devastating collision. LOIS MILLS sustained catastrophic and life-threatening injuries which left her paralyzed until her death. PIERCE MILLS also sustained serious injuries.

7. The tractor trailer was being driven by CARL THERREL. MR. THERREL and/or his wife JULIE SPIERS owned the tractor and operated a business called THERREL TRANSPORT (collectively "THERREL"). The trailer belonged to NORTH FLORIDA DIESEL ("NFD"). GREAT SOUTH TIMBER AND LUMBER ("GST") was a lumber company which identified tracts of timber and contracted with the property owners for land clearing and timber sales. NFD had contracted with GST to perform the timber clearing operations on land near where the accident had occurred. NFD cleared the land and was under contract with GST to transport the timber to various locations. NFD subcontracted the timber transport portion of its agreement with GST to THERREL. THERREL used its tractor to pull a trailer owned by NFD loaded with timber to the designated location and then returned the empty trailer to the property being cleared by NFD under contract with GST. It was in the evening after dark on one such return trip that the accident occurred. The roadway was constructed in such a fashion that the tractor trailer had to make a sharply angled turn back against its original direction of travel to complete its return trip. Typically, MR. THERREL returned during the day and a NFD representative would stop oncoming traffic for the

2

tractor trailer to make the difficult turn. MR. THERREL returned after dark in this instance and attempted to make the turn without traffic control assistance and the accident occurred.

8. On November 13, 2013, PROGRESSIVE had in force policy No.: 02065108-0, issued to NORTH FLORIDA DIESEL, INC. under which GST was a named additional insured. (hereinafter the "NFD policy.")  The NFD policy had bodily injury liability limits of $500,000 per occurrence.

9. On November 13, 2013, PROGRESSIVE also had in force policy No.: 06407843-5, issued to JULIE SPIERS, CARL THERREL, and THERREL CONSTRUCTION, LLC. (hereinafter the "THERREL policy.")  The THERREL policy had bodily injury liability limits of $1,000,000.

10. GST was an insured of PROGRESSIVE under each of these PROGRESSIVE policies for the accident.

11. An insurance carrier owes certain fiduciary duties to its insureds in the State of Florida. Those duties have been articulated by various Florida Courts and find additional support in the Florida's Code of Ethics for Adjusters and Florida's Unfair Claims Settlement Practices Act.  Under both the Common Law and the Statutory causes of action, the duties and obligations of the insurer vis a vis its insured remain the same.

12. In essence, an insurer must act fairly and honestly and with due regard for the interests of its insured. It must refrain from placing its interests above those of its insured and it must settle claims against its insured where under all of the facts and circumstances it can and should do so.

13. In the exercise of these duties, the insurer must keep its insureds advised of opportunities to settle the claims and must advise its insureds of the potential for an excess exposure.

3

The insurer must also advise its insureds of those steps the insured may take in order to protect itself from that potential for excess exposure.

14. Where coverage issues are involved, the determination of good faith involves an analysis of the carrier's actions taken to resolve the coverage issue.

15. The insurer must exercise the same degree of care and diligence as a person of ordinary care and prudence would exercise in his or her own business. It must act in good faith and with due regard for the interests of its insured. An insurer is required by Florida law to advise the insured of opportunities for settlement. An insurer must further advise its insured(s) of the probable outcome of litigation including an assessment of liability and damages; the potential for excess judgments; and non-covered elements of the claims to which the insured is exposed.

16. Where there are multiple insureds, an insurer owes the same fiduciary duties and obligations to each of its insureds in equal measure. An insurer may not place the interests of one insured above the interests of another. An insurer may not simply indiscriminately exhaust its policy limits in settlement of the claims against some insureds to the exclusion of others. A carrier must use sound reasoned settlement practices in exhausting its limits so as to minimize any excess exposure to its insured.

17. A primary insurance carrier owes the same duties and obligations to an excess insurance carrier as it owes to their mutual insured. An excess carrier stands in the shoes of a mutual insured relative to the duties and obligations the primary carrier owes to the mutual insured.

18. Florida's Code of Ethics for Adjusters governs the daily conduct of a claim professional handling a claim on behalf of his or her insured. Pursuant to this Code, an adjuster shall treat all insureds equally; shall not approach investigations, adjustments, and settlements

4

in a manner prejudicial to the insured; shall make truthful and unbiased reports of the facts after making a complete investigation; shall handle every adjustment and settlement with honesty and integrity; upon undertaking the handling of a claim, shall act with dispatch and due diligence; and shall not undertake the adjustment of any claim concerning which the adjuster is not currently competent and knowledgeable.

19. Based upon my review of the various file materials pertaining to the accident and the MILLS' claims, it is my opinion that, under the totality of the circumstances, PROGRESSIVE failed to comply with applicable industry standards relative to the claims of the MILLS against GST.

20. The conduct of PROGRESSIVE throughout its handling of the MILLS' claims regarding the accident and GST is not necessarily best described as malfeasance, but rather, as the exercise of no feasance at all.

21. The first steps in any claim investigation must be to identify who are the insureds which require protection.   The voluminous claim materials produced by PROGRESSIVE uniformly establish one undeniable fact – PROGRESSIVE NEVER appropriately undertook and completed a coverage evaluation with regard to GST. There are no attempts to actually contact GST to obtain necessary information to correctly analyze coverage – instead PROGRESSIVE relied upon anecdotal and incomplete speculation by its other insureds as to GST's role in the claim and then arbitrarily concluded GST was not covered. Although PROGRESSIVE through its corporate representative acknowledges that this was a mistake, its subsequent claim handling did not correct that mistake.

22. The closest PROGRESSIVE came to rectifying this error was in mid-May of 2014 when coverage adjuster Kerry Ratcliffe prepared an updated statutory insurance disclosure listing

5

GST as an insured under the NFD policy.  Yet the coverage adjuster never conveyed this information to the liability adjuster and on the very same day this disclosure went out, Ms. Ratcliffe retained outside defense counsel for NFD but not for GST.  When asked why, she indicated it was because coverage had not yet been confirmed and then because suit had not been filed.  When it was pointed out that those same issues pertained to NFD and yet NFD received PROGRESSIVE's retained counsel, Ms. Ratcliffe defaulted to explaining that she did what she was told to do.  PROGRESSIVE never, prior to exhausting its policy limits through a release of claims executed in August 2014 which specifically excluded GST, acknowledged GST as an insured under its THERREL policy.

23. The failure to investigate and identify GST as an insured of PROGRESSIVE was clearly in reckless disregard for GST's interests – PROGRESSIVE knew it needed to investigate and analyze, yet it did not. In November of 2013, a PROGRESSIVE manager inquired as to other omnibus insureds – yet PROGRESSIVE failed to investigate and timely identify GST as an insured.  In March of 2014, a PROGRESSIVE manager noted in its file that PROGESSIVE needed to investigate claims against GST specifically and address any omnibus insured issues – but again PROGRESSIVE never follows through with investigation. Instead, PROGRESSIVE concluded the very next day, with no investigation or legal analysis, that GST has no exposure because the trailer was not loaded at the time of the accident.

24. PROGRESSIVE also affirmatively misrepresented the coverages under its policies. PROGRESSIVE's November of 2013 insurance disclosure on the THERREL policy does not disclose GST as an insured and was never later updated to disclose GST as an insured as required by Statute.  As noted above, while it did ultimately disclose GST as in insured

under the NFD policy in April of 2014, it never even communicated that decision internally to its liability adjuster and never took any action consistent with the duties and obligations owed to an insured.

25. An insurer's duties to its insureds are independent and nondelegable. Yet once PROGRESSIVE confirmed GST had at least $1,000,000 in coverage with UNITED FIRE, PROGRESSIVE disregarded its obligation to protect GST or complete a coverage assessment as to GST under either PROGRESSIVE policy.

26. Thus, when counsel for the MILLS sought to exclude GST from the release, PROGRESSIVE acquiesced without protest. It never offered GST the opportunity to contribute a portion of PROGRESSIVE's policy limits payment so as to preserve a defense obligation for GST. PROGRESSIVE never attempted to save even $1.00 of the policy limits to preserve its defense obligation to GST. PROGRESSIVE made no effort whatsoever to protect or advance the interests of GST at all. In fact, PROGRESSIVE actively ignored contact efforts from GST's agent in June of 2014.

27. The most logical reading of PROGRESSIVE's file materials indicates that Progressive was interested only in tossing its limits and washing its hands of the MILLS' claims, to the detriment of GST and GST's excess carrier, thereby saving itself the cost of defending its insured, GST.

28. PROGRESSIVE went so far as to overtly place its own interests above those of its insureds in July of 2014 when it refused to share information and its liability investigation, including its retained accident reconstruction expert witness, with GST's excess layer of coverage - UNITED FIRE.

7

29. A carrier owes each of its insureds the same fiduciary duties and may not place the interests of one insured above those of another. Yet PROGRESSIVE engaged in a very common bad faith practice – it ignored the interests of its unnamed insured and gave priority treatment to those in whose names the policies were issued.

30. Even worse, PROGRESSIVE ignored the interest of one of its named additional insureds, GST, and gave priority to two of its other insureds and even to those who were not insureds under either of the two above-mentioned PROGRESSIVE policies.

31. Thus, PROGRESSIVE assigned defense counsel to its other insureds but not for GST, and continued to pursue the interests of its other insureds while wholly ignoring the interests of GST. PROGRESSIVE's counsel assigned to the OTHER insureds diligently pursued their clients' best interests to the detriment of GST's.

32. When asked in deposition why counsel was not retained for GST, PROGRESSIVE's representatives vacillated between claiming that coverage had not been confirmed and that suit had not been filed. However, it is indisputable that on the very same day that PROGRESSIVE finally identified GST as an insured on the NFD policy in an updated insurance disclosure (although PROGRESSIVE never identified GST as an insured on the THERREL policy in its disclosures), it retained counsel for NFD but not GST. When asked why she did that, Kerry Ratcliffe testified ultimately that it was because it was what she was told to do.

33. Had PROGRESSIVE assigned counsel to GST at the same time PROGRESSIVE assigned counsel for its other insureds, presumptively that counsel would have worked toward obtaining a release of GST rather than a settlement which explicitly excluded GST. Counsel for GST could have requested preservation of $1.00 of PROGRESSIVE's policy

8

limits. It could have advised GST to offer to contribute some of its own money to the $1,500,000 and thereby preserve the defense obligation of PROGRESSIVE.

34. Only after the decision to tender its limits was made, did PROGRESSIVE finally ask itself if GST was an insured under the NFD policy and if it had obligations to GST. The PROGRESSIVE file is devoid of any consideration of its obligations to GST under the THERREL policy. Even at this late date, after disclosing NDF as an insured on the updated disclosure to counsel for the MILLS, the coverage adjuster did not know.

35. After discussion with its outside coverage attorney, PROGRESSIVE then affirmatively determined INCORRECTLY that it had no obligations to GST at that time because there was no complaint pending with vicarious liability allegations. This is quite apparently a complete misunderstanding by PROGRESSIVE of the duties and obligations owed to any insured and is perhaps a misguided misapplication of the "duty to defend" standard. A carrier is required to investigate and evaluate ALL potential claims against its insureds arising out of an accident and to proactively seek to protect against them, whether they have been affirmatively asserted in litigation or not. In fact, PROGRESSIVE did exactly that with regard to THERREL and NFD. It ignored its obligations to GST.

36. As a result of PROGRESSIVE's complete lack of investigation and analysis as to coverage for GST, PROGRESSIVE can be seen to violate each and every basic tenant of good faith claims handling.

37. Communication with insureds is key, yet there were exactly NO attempts by PROGRESSIVE whatsoever to communicate with GST in any fashion until AFTER any possible opportunity to settle on GST's behalf had passed. If there are any such communications, they have not been produced and are not documented in the

9

PROGRESSIVE claim notes. All of the PROGRESSIVE claim representatives have either confirmed that they made no attempt to have such communication with GST or that if they had, they would have documented it in their claim notes. PROGRESSIVE also affirmatively ignored attempts by GST's agent to contact PROGRESSIVE.

38. As a result, PROGRESSIVE never timely notified GST of its potential excess exposure in this matter – in fact, it never notified GST of its actual excess exposure at all because its only communications with GST after PROGRESSIVE's tender letters to counsel for the MILLS were with regard to the NFD policy only.

39. More specifically, PROGRESSIVE sent two letters to GST under the NFD policy only, one dated June 6, 2014 and one dated June 26, 2014. True and correct copies of the June 6, 2014 and June 26, 2014 letters are attached as composite Exhibit B. Both were addressed "To Whom It May Concern." In neither letter did PROGRESSIVE acknowledge to GST that PROGRESSIVE afforded coverage under the PROGRESSIVE policies. In neither letter did PROGRESSIVE advise GST that its exposure to the MILLS may exceed the combined $1.5 million policy limits of PROGRESSIVE, or even that it may exceed the $1 million THERREL policy limits. The letters were written only as to the NFD policy and advised only that GST's exposure may exceed the $500,000 limits of that policy. In neither letter did PROGRESSIVE advise GST of any steps that it might take to protect itself. The only thing the letters did was ASK GST if it had hired its own lawyer. PROGRESSIVE's corporate representative acknowledged that there should have been separate letters addressing the THERREL policy, but there were none.

40. Nor did PROGRESSIVE timely notify GST of ongoing settlement discussions. PROGRESSIVE's only efforts at communication with GST about settlement was to inform

GST after the fact that tenders had been made but not accepted and later that settlement was not possible and that GST might wish to retain independent counsel. The PROGRESSIVE correspondence is wholly deficient. It references only the NFD policy, never acknowledges GST's status as an "insured", never provides an evaluation of the actual claims, never advises of an excess exposure over the combined policies, never notifies GST of its right to counsel or to contribute or otherwise participate in settlement discussions.

41. PROGRESSIVE likewise never notified GST before agreeing to exhaustion of its limits that in doing so it would then take the position that it owed nothing to GST, including a defense.

42. Investigation into liability and damages is also a basic cornerstone of good faith claims handling. Yet PROGRESSIVE never made any investigation into the potential liability of GST whatsoever – its only half-hearted commentary on the subject was a reflexive refusal to investigate by a claims handler who was instructed to investigate and essentially replied "we don't need to because the trailer wasn't loaded at the time."

43. Having taken the easy way out by tossing its available policy limits on behalf of a limited subset of its insureds, PROGRESSIVE then denied ANY benefit to its remaining insured, GST, by resting on policy exhaustion as a basis for refusing to defend GST when litigation proceeded.

44. Not surprisingly, while PROGRESSIVE declined to defend GST, claiming policy exhaustion, it continued to afford defense counsel to THERREL. Cindy Massion, the outside counsel retained and paid for by PROGRESSIVE to represent THERREL, has testified that after she sent the executed release which specifically excluded GST from any

protection in exchange for PROGRESSIVE's $1.5 million combined limits, she initially closed her file, but then re-opened it several times thereafter, billing all of her time to PROGRESSIVE, including at one point to travel to and attend a vehicle inspection of the THERREL tractor at the THERREL property when the expert retained by UNITED FIRE on behalf of GST inspected it.

45. While exhaustion of limits may be a defense to a continuing duty to defend under the contract under the appropriate circumstances, the carrier may not exhaust in bad faith. Here, PROGRESSIVE exercised no faith at all toward GST, violating each and every industry standard applicable to a carrier's duties and obligations to its insured and as such did not "exhaust" its duty to defend GST with the payment of its policy limits on behalf of other insureds in good faith.


FURTHER AFFIANT SAYETH NAUGHT.

_____
WILLIAM D. HAGER


STATE OF Minnesota          )
COUNTY OF Ottertail         )

BEFORE ME, the undersigned authority, personally appeared WILLIAM D. HAGER, who is:

_____ personally known to me, or
  X   provided proper identification
       [Type: Driver's License          ]

and, who, upon being first duly sworn according to law, deposes and says that he executed the foregoing Affidavit and it is true and correct to the best of his knowledge and belief.

12

IN WITNESS WHEREOF, I have hereunto set my hand and affix the seal of my office in
the County and State last aforementioned this **14** day of **September**, 2020.

_____
NOTARY PUBLIC

Amanda Rose Huck
_____
(Print Name as Commissioned)

MY COMMISSION EXPIRES: Jan 31 2021



13

United Fire & Casualty
Company


Plaintiff


v.


Progressive Express
Insurance Company


Defendant.


In the United States District Court
For the Middle District of Florida
Orlando Division


Case No. 6:19-CV-1049-Orl-41EJK


**Expert Report**
Submitted by
William D. Hager
On Behalf of
The Plaintiff


Exhibit A

**TABLE OF CONTENTS**

I.      Introduction ..................................................................................3
II.     Specific Expertise ……....................................................................5
III.    Expert Opinions and Further Discussion….…………………….…...16
IV.     More General Expertise to Render These Expert Opinions....………22

**APPENDICES**

Appendix A…………………………………………...…….Curriculum Vitae
Appendix B ……………………………………Speeches and Publications
Appendix C ………………………………………….………Prior Testimony
Appendix D ………………………………………...Documents Reviewed

# I. Introduction.

**Introduction.**  I have been retained as an expert witness in this case by the law firm Neilson & Associates, P.A. on behalf of the Plaintiff Untied Fire & Casualty Company (United Fire) in its lawsuit against Progressive Express Insurance Company (Progressive).

**Ongoing Considerations.**  I am submitting this Report on the specific issues stated herein.  I reserve the right to amend and otherwise modify this Report, including its summaries, opinions, and all other elements.  Specifically, it is possible that additional information and documents will require subsequent consideration in connection with (i) the opinions expressed in this Report and (ii) possible opposing expert opinions.  As to the opinions set out below in this Report, I have reached these opinions based upon a reasonable degree of professional certainty.

**Qualifications to Render These Expert Opinions**.  My opinions are based on my skill, knowledge, training, education, expertise, and experience, which are detailed in the attached Curriculum Vitae (see Appendix A), as well as on my specific expertise set out on my referenced websites and as set out below under Section II and IV of this Report.

**Sources of Information.**  I obtained documents and used resources from: (i) Neilson & Associates, P.A. as more fully detailed below; (ii) standard commercial auto reference materials; and (iii) certain regulatory materials including, among others, materials from State of Florida (including rules and regulations of the Florida Insurance Department ("FL-OIR")) and from the National Association of Insurance Commissioners (sometimes "NAIC") as utilized by the FL-OIR.  See my later discussion of these materials.

**Foundation to All of the Opinions**.  Thus, each of the expert opinions and conclusions in this Report is based on a combination of (i) my skill, knowledge, training, education, expertise, experience and working knowledge of the specific areas and matters at issue herein, (ii) prevailing standards in the industry including custom and practice and (iii) documents cited.

**Reasonable Degree of Professional Certainty.**  As stated, I have reached these opinions based on a reasonable degree of professional certainty.

**Prudent Commercial auto Insurer.**  These opinions are based on what a reasonably prudent commercial auto insurer should and would do in comparable circumstances.

**Ongoing Discovery.**  I am submitting this Report on the specific matters set out below in connection with this litigation.  I understand that this case is in ongoing discovery and as such, I reserve the right to amend and otherwise modify this Report including its summaries, opinions, and all other elements.

**Limitations of All of These Expert Opinions.**  These entire expert opinions and conclusions relate to and are specifically limited to the unique facts of this case; as such, these opinions do not have applicability beyond the facts of this case.  Specifically, these opinions do not relate to any other case.

**Compensation.**  I am being compensated at the rate of $500 per hour for my work on this case. This is my usual and customary rate.

## TERMS.

I use certain terms in this Report, and those terms have the following meanings, unless the context requires otherwise.

**Commercial Auto Insurer.**  When I use this term or its equivalent in this Report, I mean insurers in general who sell and adjust claims as to commercial auto insurance like that at issue in this case.

**Commercial Auto Insurance.**  When I use this term in this Report, I mean commercial auto Insurance.

**Insurance Agent or Agent.**  When I use either of these terms in this Report, I mean a person or entity licensed  to sell insurance.

**Progressive.**  When I use this term in this Report, I mean Progressive Express Insurance Company;

**FL-OIR.**  When I use this term in my Report, I mean the Florida Insurance Department;

**NAIC.**  When I use this term in this Report, I mean the National Association of Insurance Commissioners.

**Obligations and Responsibilities.**  When I use this term or its equivalent in this Report, it is inclusive, among other things, of an insurer's defense (i.e., duty to defend) and indemnity (i.e., duty to indemnify) obligations.

**Policy.**  When I use this term in this Report, I mean the commercial auto insurance policies as issued by Progressive during the relevant times of this matter;

## II.  SUMMARY OF MOST RELEVANT EXPERTISE.[1]

In connection with these opinions, I have drawn on my expertise (i) as summarized immediately below here in Section II of the Report and at Section IV of this Report and (ii) as set forth in my Curriculum Vitae, attached and including referenced websites.

This case calls for expertise as to, among other things, the following matters: (1)  commercial auto insurance policies including matters of who is an insured – and policy endorsements - as these policies are utilized by the insurance industry; (2)  the regulations of such insurers and policies,[2] (3) an insurer's claim settlement obligations and responsibilities (inclusive of issues of good faith

---

[1]  In summary fashion, I set out here my qualifications as to this matter.  These qualifications should be read together with my Curriculum Vitae as set forth at Appendix A of this Report, including my website at www.expertinsurancewitness.com and materials therein relating to commercial auto matters and insurance agents and the additional materials set forth in Section IV of this Report.
[2] Progressive issued the commercial auto policies at issue during the relevant time of this matter.

and bad faith; in this Report I sometimes refer to these collective matters as the insurer's "obligations and responsibilities"), and (4) an insurer's related coverage obligations and responsibilities under such policies including the duty to defend and the duty to indemnify its insureds.[3]

***Commercial Auto Insurance Expertise:  State Insurance Regulation.***  My expertise as to these matters can be found as follows: I am a former:

- Commissioner of Insurance (Iowa), as appointed by the Governor of Iowa;

- First Deputy Commissioner of Insurance, as appointed by the Commissioner of Insurance;

- Administrative Law Judge ("ALJ," f/k/a "Hearing Officer") to the Department of Insurance, as appointed by the Commissioner of Insurance; and

- Assistant Attorney General assigned on a full-time basis to the Department of Insurance, as appointed by the Attorney General of Iowa.

In those capacities, on a daily basis, I had full regulatory oversight and responsibility for and I dealt directly with commercial auto insurers and their policies and their obligations and responsibilities to insureds and insureds' obligations under such policies, including: (1) commercial auto insurance policies including matters of who is an insured – and policy endorsements - as these policies are utilized by the insurance industry; (2)  the regulations of such insurers and policies, (3) an insurer's claim settlement obligations and responsibilities, and (4) an insurer's related coverage obligations and responsibilities under such policies including the duty to defend and the duty to indemnify.[4]

---

[3] I do not enter legal opinions in this Report.  My opinions are based on custom and practice in the industry that come to bear on this matter.  At the same time, insurance is perhaps one of the most highly regulated areas of commerce in the U.S. and as such, it is not possible to review an insurer's handling of a claim/defense without reference to rules and regulations that apply to the insurer and the transactions at issue.

[4] Because the insurance business is conducted across state lines and more specifically, nationally, the Insurance Codes and Department of Insurance rules and regulations (by whatever name and by whatever state) are substantially similar state over state.  This is so because much of insurance regulation, though conducted primarily at the state level, is a result of adoption of national model statutes and administrative regulations as promulgated by the nation's Insurance Commissioners through the National Association of Insurance Commissioners (NAIC) so as to assure uniformity state over state.  By way of example, Iowa's unfair claims practices act, by whatever formal name, is substantially similar to that throughout the U.S., including the comparable act in Florida – this is because both are based on the NAIC Model Act, the statutory form of which I enforced in Iowa.  My point is that my regulatory experience is substantially similar to parallel experience and positions throughout the U.S. (e.g., the position of Commissioner of Insurance or its titled equivalent in each of the other 49 states, including the Florida Commissioner of Insurance).  This experience is bolstered by my 45 years of direct insurance experience, including that of being a CEO of a major property casualty entity, located in Florida and doing business throughout the U.S. and my eight years of experience as an elected Member of the Florida House of Representatives where I have served a Member and as Vice Chairman of the Insurance Committee and served as well - on its upstream parent committee, the Commerce Committee, with statutory oversight over commercial auto insurance, including its regulation (as executed by the Florida Office of Insurance Regulation – "FL-OIR"; as referenced the regulation of insurance in Florida is substantially similar to the regulation of insurance in Florida) and my 20 years or so as a certified (ARIAS-US) insurance and reinsurance arbitrator where I sit typically on a panel of three arbitrators in disputes between commercial auto insurers and other Commercial auto insurers and between commercial auto insurers and their reinsurers.  These disputes are the subject of contract between the parties

As a regulator for eight years in four Iowa positions, namely: (i) Administrative Law Judge to the Department of Insurance, (ii) Assistant Attorney General assigned to the Department of Insurance, (iii) First Deputy Commissioner of Insurance and (iv) Commissioner of Insurance, along with my staff, I approved (or disapproved) of the language of commercial auto insurance policies used by each of the 1,000 property casualty insurance companies doing business in the state,[5] selling among other coverages, the type of policy at issue in this case.

This regulatory action also included the approval of most all policy forms in use today. These responsibilities also included oversight over the insurers' claim handling obligations including issues like that here.  In addition, I regularly served as an Administrative Law Judge in matters relating directly to commercial auto insurance policies.

***Commercial Insurance Expertise:  National Insurance Regulation.***  My expertise as to these matters can be found as follows: I am a former:

- Member of the National Association of Insurance Commissioners ("NAIC");

- Elected Chair of the NAIC Midwest Zone;

- Elected Member of the NAIC Executive Committee.

In those capacities, on a regular basis, I had national regulatory oversight and responsibility for and I dealt directly with commercial auto insurers and their policies and their obligations and responsibilities to insureds and insureds' obligations under such policies including as follows: (1) commercial auto insurance policies including matters of who is an insured – and policy endorsements - as these policies are utilized by the insurance industry; (2)  the regulations of such insurers and policies, (3) an insurer's claim settlement obligations and responsibilities, and (4) an insurer's related coverage obligations and responsibilities under such policies including the duty to defend and the duty to indemnify.

The NAIC "C" Committee, the committee dealing with property casualty issues, reported directly to the Executive Committee.  Included in the "C" Committee's jurisdiction are commercial auto matters, including policy forms and insurer obligations from a national/U.S. perspective.

- **NAIC Property Casualty Insurance (C) Committee.**  As a member of the NAIC and more to the point as a Member of the Executive Committee, I had oversight responsibility over the so –called NAIC "C" Committee, which was responsible for most all property casualty issues, including as here, commercial auto issues.  The responsibilities and mission of the "C" Committee are as follows[6]

---

and call for decisions by the arbitration panel that is binding and final – upon the parties, including the award of monetary relief, as warranted.

[5] Some, but not all of whom sold commercial auto policies.

[6] As set forth by the NAIC itself on its website.

**Mission:** "to monitor and respond to problems associated with the products, delivery and cost in the property/casualty insurance market and the surplus lines market as they operate with respect to individual persons and businesses. The Committee also is to monitor and respond to problems associated with financial reporting matters for property/casualty insurers that are of interest to regulatory actuaries and analysts and to monitor and respond to problems associated with the financial aspects of the surplus lines market."

***Commercial Auto Insurance Expertise: Most Recent Legislative***. In addition to my state and national insurance regulatory background, I have served in the following capacities, each of which includes daily knowledge of and interaction with commercial auto insurers and their obligations and responsibilities to their insureds under such policies in the following ways and as to the following considerations: (1) commercial auto insurance policies including matters of who is an insured – and policy endorsements - as these policies are utilized by the insurance industry; (2) the regulations of such insurers and policies, (3) an insurer's claim settlement obligations and responsibilities, and (4) an insurer's related coverage obligations and responsibilities under such policies including the duty to defend and the duty to indemnify.

- Elected Member of the Florida House of Representatives (currently – I was first elected in 2010 and re-elected in 2012 and 2014 and 2016 – 1/2019, at which time I was term limited) where I have served as a Member and Vice Chairman of the Insurance Committee and have served as a Member of its upstream parent committee, the Commerce Committee (among other committees), which has legislative oversight over all insurance operations in the state (as administered by the Florida Office of Insurance Regulation) including those relating to commercial auto insurance and related insurer and insured obligations.

- In addition, I have served as Vice Chairman of the Civil Justice Subcommittee of the Florida House, which has responsibilities as to Florida laws that establish (among other things) liability,

***Commercial Auto Insurance Expertise: Prior Legislative***.  In addition to my state and national insurance regulatory background and my current legislative work as set out above, I also have served in the following legislative capacities, each of which included ongoing knowledge of and interaction with commercial auto insurers and their obligations and responsibilities to their insureds under such policies, including in the following ways and as to the following considerations: (1) commercial auto insurance policies including matters of who is an insured – and policy endorsements - as these policies are utilized by the insurance industry; (2) the regulations of such insurers and policies, (3) an insurer's claim settlement obligations and responsibilities, and (4) an insurer's related coverage obligations and responsibilities under such policies including the duty to defend and the duty to indemnify.

- Legal Counsel to the Iowa House of Representatives;

- Chief of Staff at the U.S. House of Representatives;

- Elected Member of the Boca Raton City Council, where I served as an elected Member and as Deputy Mayor; I was the City Council's lead Member as to all insurance matters.

7

***Commercial Auto Insurance Expertise:  Industry.*** In addition to my state and national insurance regulatory background and my current and prior legislative background as to commercial auto matters, I have served or am serving in the following capacities, each of which included daily knowledge of and interaction with commercial auto insurers and their obligations and responsibilities to their insureds under such policies.

- President and Chief Executive Officer of the National Council on Compensation Insurance, a major non-traditional U.S. property casualty insurance company doing business throughout the United States;

- I served as President and Chief Executive Officer for the National Council on Compensation Insurance ("NCCI"), which has and is conducting business throughout the U.S.  NCCI is a nationwide industry owned organization with (when I served as CEO) about 1,500 employees with annual revenues of about $150 million;

- This means while CEO, NCCI was subject to the full regulatory authority of the various state departments of insurance as well as the state and federal courts of each of these states;

- Among my responsibilities at NCCI was (together with my staff) to formulate all workers compensation insurance policy forms as used in our 40 states of operation. This work included drafting all policy language (tailored to the specific state's insurance code) as well as drafting all endorsements and all other policy forms. In addition, my responsibilities included gaining state insurance department approval of all such policy forms as a condition precedent to their use as submitted by some 600 insurance companies. I am very familiar with the meaning and relevance of specific state approval of policy forms, endorsements and applications and related documents and matters and related insurer and insured obligations under policy forms.  The point here is that I am very familiar with property casualty insurance policy forms including commercial auto and their use and their construction.

***Commercial Auto Insurance Expertise:  Actuarial.***[7]   In addition to my state and national insurance regulatory background and my most recent and prior legislative background and my industry background as to commercial auto matters, I have served or am serving in the following actuarial/ industry capacities, each of which included daily knowledge of: (1) commercial auto insurance policies including matters of who is an insured – and policy endorsements - as these policies are utilized by the insurance industry; (2)  the regulations of such insurers and policies, (3) an insurer's claim settlement obligations and responsibilities, and (4) an insurer's related coverage obligations and responsibilities under such policies including the duty to defend and the duty to indemnify.

- *American Academy of Actuaries*, Washington D.C.  I served as general counsel and chief lobbyist to the Academy, whose role to actuaries is parallel to that of the AMA to

---

[7] I recognize that actuarial matters are not at issue in this matter, at least not directly, nonetheless, I set out these positions as they show the overall scope of my background.

physicians and the ABA to lawyers.  Academy members determine pricing for commercial auto matters at issue in this matter.

- *Actuarial Standards Board (ASB).*  I served as well as counsel to the Interim Actuarial Standards Board, the forerunner to ASB.  ASB, which is to the actuarial profession as to what the Financial Accounting Standards Board (FASB) is to the accounting profession, promulgates and enforces professional standards upon the work product of actuaries.  Those standards include rate making standards that apply to the pricing of commercial auto matters at issue in this matter.

- *National Council on Compensation Insurance (NCCI).*  As President and CEO of this Company, I had about 1,500 employees, of which 150 resided in the Actuarial Department, as qualified actuaries and as paraprofessionals in support of the actuaries.  That Department reported to me.

- *Commissioner of Insurance;*  In this position, in which I served for a total of four years, I had full regulatory responsibility over the commercial auto policy forms and pricing of commercial auto policies.

- *First Deputy Commissioner of Insurance:* In this position, I had similar responsibility for commercial auto insurance like that at issue here, as I did as Commissioner of Insurance.

- *Degree in Mathematics.*  I have a bachelor's degree in mathematics,[8] which is the intellectual foundation of actuarial science.

**Commercial Auto Insurance Expertise:  Insurance Arbitration.** In addition to my state and national insurance regulatory background and my prior and current legislative and my industry background and my actuarial background as to commercial auto matters, I have served or am serving in the following capacities, each of which included daily knowledge of and interaction with commercial auto insurers and their obligations and responsibilities as follows: (1) commercial auto insurance policies including matters of who is an insured – and policy endorsements - as these policies are utilized by the insurance industry; (2)  the regulations of such insurers and policies, (3) an insurer's claim settlement obligations and responsibilities, and (4) an insurer's related coverage obligations and responsibilities under such policies including the duty to defend and the duty to indemnify.
- *Nationally Certified Insurance Arbitrator* (ARIAS-US), where I sit as an insurance arbitrator on disputes between (among others) commercial auto insurers and other insurers;

**Commercial Auto Insurance Expertise:  Reinsurance Arbitration.** In addition to my certification as an *insurance* arbitrator, I am also certified as a *reinsurance arbitrator* - which included daily knowledge of:  (1) commercial auto insurance policies including matters of who is an insured – and policy endorsements - as these policies are utilized by the insurance industry; (2)  the regulations of such insurers and policies, (3) an insurer's claim settlement obligations and

---

[8] Secondary mathematics education.

9

responsibilities, and (4) an insurer's related coverage obligations and responsibilities under such policies including the duty to defend and the duty to indemnify.

- *Nationally Certified Reinsurance Arbitrator* (ARIAS-US), where I sit as a reinsurance arbitrator on disputes between (among others) commercial auto insurers and their reinsurers;

**Commercial Auto Insurance Expertise: Insurance Lawyer.**  In addition to my state and national insurance regulatory background and my current and prior legislative background and my industry background and my actuarial background and my insurance and reinsurance arbitration background as follows: (1) commercial auto insurance policies including matters of who is an insured – and policy endorsements - as these policies are utilized by the insurance industry; (2) the regulations of such insurers and policies, (3) an insurer's claim settlement obligations and responsibilities, and (4) an insurer's related coverage obligations and responsibilities under such policies including the duty to defend and the duty to indemnify.

- Florida insurance lawyer (*Hager Law Firm*, Boca Raton, Florida), currently in private practice, with my practice limited to insurance and reinsurance matters;

**Commercial Auto Insurance Expertise: Prior Legal Work.**  In addition to my state and national insurance regulatory background and my current and prior legislative background and my industry background and my actuarial background and my reinsurance arbitration background as to commercial auto matters, I have served or am serving in the following legal capacities, each of which included current and ongoing knowledge of and interaction with commercial auto insurers and their obligations and responsibilities to their insureds under such policies.

- As stated, I am an insurance lawyer admitted to practice, all by examination in Iowa, Illinois[9] and Florida.

- Legal Counsel to the Iowa House of Representatives;

- Assistant Attorney General (IA);

- Iowa Counsel to the Professional Insurance Agents Association, whose members sell commercial auto insurance -  as retail insurance agents;

- Iowa Counsel to the Property Casualty Insurance Association of America (PCIAA), smaller stock insurance company, many of whose members are commercial auto insurers;

- Insurance lawyer with the firm of *Hager and Schachterle*, Des Moines;

- General Counsel to the American Academy of Actuaries, Washington D.C.;

---

[9] This license is currently in inactive status at my request and is eligible for reactivation at any time upon my request. This is so because I am and continue to be in good standing with the Illinois Bar.

***Commercial Auto Insurance Expertise: Undergraduate Educational Background.*** In addition to my state and national insurance regulatory background and my current and prior legislative background and my industry background and my actuarial background and my reinsurance arbitration background and my legal background as to commercial auto matters, the following formal undergraduate educational background was also helpful in this matter:

- Bachelor's degree (B.A.) in mathematics (University of Northern Iowa);

***Commercial Auto Insurance Expertise: Graduate Educational Background.*** In addition to my undergraduate background, my graduate educational background was also helpful in this matter:

- Master's degree (M.Ed.) in education (University of Hawaii);

- Juris Doctorate: (J.D.) University of Illinois, Champaign Urbana;

**Commercial Auto Expertise: Licenses.** In addition, the following licenses also support my expertise in these matters.

- Members of the following bars, all by separate and free-standing examination: Illinois, Iowa, and Florida;

- Admitted to practice before the U.S. Supreme Court;

**Commercial Auto: Insurance Certificates.** In addition to my regulatory experience at the state and national level, my legislative, industry, actuarial, arbitration and legal background and my educational background – my insurance certifications also show applicable expertise as follows:

- Reinsurance Arbitrator certified by ARIAS-US;

- Insurance Arbitrator certified by ARIAS-US;

**Commercial Auto: Appointments.** In addition to my regulatory experience at the state and national level, my legislative, industry, actuarial, arbitration and legal background and my educational background and my insurance certificates– my appointments also show relevant background and applicable expertise as follows:

- Mathematics Instructor; appointed by the Hawaii Department of Education;

- Graduate, the National Association of Insurance Commissioners (NAIC) -  Commissioners School;

- Member of the Organization of Past U.S. Insurance Commissioners, the Passé Club;

- Member of the NAIC;

11

- Elected Chair of the NAIC Midwest Zone;

- Elected Member of the Executive Committee of the NAIC;

- Appointed Commissioner of Insurance by the Governor of Iowa

- Appointed Assistant Attorney General for the State of Iowa, Assigned to the Department of Insurance, by the Attorney General of Iowa;

- Appointed Chief Deputy Commissioner of Insurance, by the Commissioner of Insurance;

- Appointed Administrative Law Judge, f/k/ Hearing Officer, by the Commissioner of Insurance;

- Appointed Legal Counsel to the Minority of the Iowa House of Representatives, by the House Minority Caucus;

- Appointed Chief of Staff , f/k/a Administrative Assistant, at the United States Congress by Congressman Tauke;

- Appointed President and Chief Executive Officer of NCCI, by its Board of Directors;

### Elections to Public Office as a Basis for Expertise.

The following positions to which I was elected, helped inform my knowledge of applicable public policy in this matter:

- Elected Member of the West Des Moines, Iowa Board of Education;

- Elected Member of the City Council of Boca Raton Florida,

    o   Elected: 2002;

    o   Re-elected in 2004; and

    o   Re-elected in 2006.

- Elected Deputy Mayor of the City of Boca Raton, Florida;

- Elected Member of the Florida House of Representatives for Palm Beach County:

    o   Elected 2010;

    o   Re-elected in 2012;

12

- o   Re-elected in 2014; and

- o   Re-elected in 2016.

- o   Term limited as of January 1, 2019.

- Appointed Chair of the Florida House Judiciary Appropriations Committee, with annual appropriations of some $5 billion with appropriation jurisdiction over Florida's Court System including Florida's District Courts, Court of Appeals and Supreme Court; and the Attorney General's Office; the Offices of District Prosecutors; the Offices of the Public Defenders; and the Florida Prison System and others.

## ADDITIONAL COMMERCIAL
## AUTO EXPERTISE AS TO INSURER OBLIGATIONS

***Commercial Auto Expertise: Commercial Auto Insurer Obligations.*** Having discussed commercial auto policies, I next discuss insurer obligations under such policies.  In this regard, I have also had significant experience and responsibility in connection with determining and passing judgment on commercial auto insurers' responsibilities as to their defense and coverage and claim duties such as those involved here.

In particular, in my four regulatory positions previously described, I had daily responsibility to assure and to hold accountable all of the state's 1,000 property casualty insurers[10] for their related obligations and responsibilities, inclusive of defense and coverage obligations. I did so through a series of action steps and tools. The action steps and tools included the following:

    **1. Coverage[11] and Claims Obligations: Unfair Claims Settlement Act**. Like most every other state including Florida, Iowa has enacted the model NAIC Unfair Claims Settlement Practices Act ("UCSA")[12] which set forth standards against which the Insurance Commissioner can pass judgment on a commercial auto insurer's defense and coverage and claims obligations. As Commissioner and as First Deputy and earlier as Assistant Attorney General assigned to the Department and as a Department ALJ, I had daily responsibility to enforce this act and assure all insurance companies were in compliance with the act. That was the same act as adopted in most every other state in substantially similar form and enforced on regular basis by the state Departments of Insurance (DOIs), including the FL-OIR.

    **2. Coverage and Claim Obligations: NAIC Market Regulation Handbook**. In addition to the standards set out in the UCSA, as Commissioner, I had as an available tool, the NAIC Market Regulation Handbook ("Handbook"). This Handbook sets forth standards to assess insurer claim settlement behavior and is used by every department of insurance in the United States including the FL-OIR. The standards have been universally agreed to by all of the nation's Commissioners of Insurance as adopted formally by them through the NAIC. The defense and coverage and claim

---

[10] Not all property casualty insurers sold commercial auto policies, but many did.

[11] This term, as used in my Report, is inclusive of an insurer's claim, defense, and indemnity obligations.

[12] By whatever formal name known.

standards of the Handbook are universally recognized as appropriate standards against which to judge insurer claim behavior.

**3. Coverage and Claim Obligations: NAIC Financial Examiners Handbook**. As Commissioner, I had available another tool, namely the NAIC Financial Examiners Handbook ("Financial Examiners Handbook"). Among other things, the Financial Examiners Handbook sets forth standards to assess property casualty (inclusive of those property casualty insurers who sold commercial auto insurance policies) insurer solvency on a triennial basis. Among other documents reviewed by examiners in reaching financial conclusions are agent contracts and policyholder matters. The Financial Examiners Handbook is used by every department of insurance in the United States including the FL-OIR. Similarly, these standards have been universally agreed to by all of the nation's Commissioners of Insurance as adopted formally by them through the NAIC, including Iowa's Commissioner of Insurance The standards of the Financial Examiners Handbook are universally recognized as appropriate standards against which to judge commercial auto insurance insurer behavior and used by the FL-OIR in that regard.

**4. Coverage and Claim Obligations: Complaints from the Public**. On a daily basis, my Department received incoming consumer complaints as to insurance company defense and coverage practices. This division was staffed by Department lawyers who resolved the individual complaint but equally important, those lawyers also determined whether an insurer evidenced unacceptable defense and coverage practices. That is to say, staff lawyers determined whether the incoming consumer complaints in fact constituted a red flag as to the insurance company's potential behavior across the board.

**5. Coverage and Claim Obligations: Prosecution**. To the extent insurer behavior required formal action (whether a result of complaints from the public or a result of Department investigation through a Market Conduct Examination), my Department prosecuted such insurers under the state's civil Administrative Procedures Act. In connection with such prosecutions, I served in various capacities during my eight years as a regulator as (i) prosecutor (as Assistant Attorney General), (ii) as the decision maker as to whether to initiate prosecution in the first instance and (iii) as the Administrative Law Judge ("ALJ") who presided over the prosecution and defense of the case and entered findings of fact and conclusions of law as to insurer defense and coverage practices. I have served as an ALJ in scores of such cases where the insurer's defense and coverage and claim practices in commercial auto matters were the primary issue and entered final decisions in such matters.

**B.    Expertise as to Claim Adjustment Obligations and Responsibilities of Insurance Companies from the Perspective of an Industry Executive**. In addition to my experience as a regulator, as reflected above, I have had specific industry experience (in other positions) as to insurer defense and coverage practices. Some of those positions included the following:

**1.    Coverage and Claims Obligations: CEO of a Major US Insurance Organization, Regulated Throughout the US**; **NCCI**; President and Chief Executive Office of the National Council on Compensation Insurance, (1990 – 1998).  I referenced above, under policy expertise, my experience at NCCI. In addition to exposure as to insurance policy forms, this same NCCI experience also provided significant background as to insurer defense and coverage obligations.

In addition, and relevant to this case, NCCI had a vested interest in member insurer claim practices in that the industry's reputation for fair defense and coverage practices ultimately impacted regulatory attitudes toward NCCI's premium approval process.

While President and CEO of NCCI, I visited and physically toured and reviewed in excess of 400 insurance companies and gained direct exposure to the procedures and processes and standard industry practices of the U.S. insurance community and its defense and coverage practices. I have had extensive exposure to insurer practices and procedures. As stated, NCCI is regulated fully by the FL-OIR and subject to the state and federal courts of Iowa and it does business throughout the U.S., including most states.  In that capacity, it is regulated by the State Department of Insurance of the respective states and subject to the authority of the state and federal courts of such states.

**2. Coverage and Claim Obligations: General Counsel and Director of Government Relations to the American Academy of Actuaries** (Washington D.C.), 1980 – 1983. I served as General Counsel and Director of Government Relations for the American Academy of Actuaries, including advising on admissions, discipline, federal antitrust and general corporate law. I represented the 20,000-member professional organization before Congress (e.g., Senate Committees on Banking, Commerce, Finance and Labor, and House Committees on Education, Labor, Energy, and Ways and Means) and the various federal regulatory agencies.

The Academy is the professional organization of actuaries and includes qualified actuaries from all disciplines and all forms of insurers. Academy members included affiliation with virtually every commercial auto insurance company in America. Such actuaries had duties relating to policy language and policy pricing. The Academy's Board of Directors was likewise made up of leading insurance company executives from such commercial auto companies.

**3. Coverage and Claim Obligations: Attorney in Private Practice**. As an attorney in private practice, I represented a number of insurer interests and became familiar with applicable regulatory and industry defense and coverage standards of practice. Those interests included the position of Iowa Counsel to the Property Casualty Insurance Association of America (PCIAA) as discussed below. Those interests also included intimate involvement with commercial auto insurance, as counsel to the:

- Professional Insurance Agents of Iowa, however formally named (property casualty insurance agents, who sold, among other coverages, commercial auto insurance policies);

- Iowa Association of Life Underwriters, however formally named (life, health, and annuity insurance agents); and

- The Property Casualty Insurers Association of America ("PCIAA"); as stated above, I served as Iowa Counsel to this insurance trade group, the trade association of smaller stock property casualty insurers (who sold, among others, commercial auto insurance policies).

15

Specific duties as counsel at both the Professional Insurance Agents of Iowa (who sold, among other coverages, commercial auto insurance) and the PCIAA included in-depth familiarity with commercial auto insurers, their defense and coverage practices. Specific duties at the PCIAA included daily counsel to member insurers as to their defense and coverage duties.

**C. Expertise as to Claim Settlement Obligations Continued.** As stated, my expertise as to obligations for auto insurers in circumstances such as here is derived as well from:

- My 8 years as an Elected Member of the Florida House of Representatives, where I served on the Insurance Committee as a Member and as Vice Chair, and where I served as well as a Member of the Insurance Committee's upstream parent committee, the Commerce Committee. In those capacities, I regularly served with respect to public policy matters relating to insurers, including commercial auto insures – as to their claim settlement obligations; and

- My 20 or so years as a reinsurance arbitrator where I sit in claim disputes between commercial auto insurers and their reinsurers;

**D. Expertise as to Agents Who Sell Commercial Auto Insurance.**[13] I have significant experience as to insurance agents who sell commercial auto insurance, as set out elsewhere in this Report and as set out below:

1. *Expertise as to Insurance Agents as a Regulator/Prosecution*. I have had extensive and substantive experience relating directly to the duty of care that comes to bear on property casualty agents as to commercial auto insurance matters in their various relationships with commercial auto insurance companies and their insureds. As an Assistant Attorney General, I have prosecuted commercial auto insurance agents for violations relating to their duty of care. In this regard, I have initiated revocation actions against the producer's license and prosecuted those actions to completion.

2. *Expertise as to Insurance Agents as a Regulator: Pre-Licensure Background Investigations*. As an insurance regulator (Commissioner of Insurance and First Deputy Commissioner of Insurance), along with my staff, I have screened hundreds of thousands of agents, including applying commercial auto agents for character and background (separate and apart from subject matter testing).

3. *Expertise as to Insurance Agents as a Regulator as to commercial auto Insurance: as a Regulator: Formulating Licensing Exams*. As to subject matter, I have formulated producer-licensing exams in the first instance. Upon passage of the exam, I have licensed hundreds of thousands of insurance producers.

4. *Expertise as to Insurance Agents as a Regulator as to commercial auto Insurance: Appointments*. In addition to licensure, all insurance agents (and other producers of insurance) require a formal appointment by an insurance company before they can represent that company.

---

[13] Although insurance agent matters are not directly at issue in this case, I set out my related background as evidence of my overall expertise.

The appointment must be filed with and approved by the Commissioner of Insurance as a condition precedent to representing that insurer in the state. As Commissioner of Insurance, I oversaw this appointment process and approved hundreds of thousands of such appointments by insurance companies of their agents and brokers.

5. *Supervision of the Relationship Between Insurers and Agents.* I have supervised as well the ongoing relationship of all insurance companies with all of their appointed producers of insurance including commercial auto insurance agents.

6. *Expertise as to Insurance Agents as a Regulator: Continuing Education.* I have had full responsibility for continuing education for licensed commercial auto insurance agents (approving CE courses in the first instance for acceptable content; overseeing the administration of such courses and granting and denying credit for such courses).

7. *Expertise as to Insurance Agents as a Regulator: Administrative Law Judge.* I have sat as the Administrative Law Judge in such actions as to commercial auto insurance agents and entered findings of facts and conclusions of law in scores of cases in which the producers were prosecuted for violations relating to standards of care in connection with insurance matters.

8. *Expertise as to Insurance Agents and Brokers: Legal Representation.* As a lawyer, I have defended agents against allegations (in administrative law forums) of violations of their duty of care.

9. *Expertise as to Insurance Agents: Industry CEO.* As President and Chief Executive Officer of a major U.S. Property Casualty insurance organization (NCCI – workers compensation) doing business in some 40 states, I have had substantial working relationships with the U.S. insurance agent and agency community including ordinary and surplus lines agents. Almost all insurance is sold or produced by producers of insurance.

10. *Expertise as to Insurance Agents: Practice of Law.* As a practicing attorney (Iowa), I represented the Professional Agents of Iowa (PIA), the association of property casualty insurance agents. I also represented the life insurance and annuity and health agents at that same time. Their organization was then called the Iowa Association of Life Underwriters.

11. *Expertise as a Member of the State Legislature*. I am currently an elected Member of the Florida House of Representatives, where I serve from House District #89 (Palm Beach to Boca Raton). Among other roles, I have been a Member of the House Insurance Committee and Vice Chairman of that Committee and am currently a Member of that Committee's parent Committee, the Commerce Committee, both of which have statutory oversight of insurance agents. As a Member of those Committees, among other things, I have sponsored or co-sponsored any number of related insurance bills.

### Other Expertise.

**Other Expertise**. The above expertise should be read together with the balance of my background as set forth:

- My overall insurance expertise can be viewed at this website https://expertinsurancewitness.com/,

- More specifically as to commercial auto expertise it can be viewed at https://expertinsurancewitness.com/auto-insurance-policy-expert/

- As to insurance agent expertise, see https://expertinsurancewitness.com/insurance-agent-liability-expert/

- And as set forth in my attached CV at Appendix A of this Report.

The above website, among other things, includes click through expertise as to (i) insurer bad faith, (ii) industry standards and custom and practice, (iii) policy interpretation and (iv) unfair claim practices.  In the aggregate, these experiences as set out above and as set out at my website - have given me a significant grounding to provide expertise as to Commercial Auto and insurance subrogation testimony.

### III.  ASSIGNMENT AND EXPERT
### OPINIONS AND FURTHER DISCUSSION

**Assignment.**  My assignment was to read and review various records and documents in this case and then enter expert opinions, if any as to the following: (1) Progressive's claim handling in this matter; and (2) whether Progressive met its claim handling obligations and responsibilities.

**Facts.**  It may be helpful to set out some of the facts or alleged facts that can be gleaned from the record in this matter or otherwise surmised from the record.  The facts below are not a finding of facts or statement of facts or anything of the sort.  The facts below  are simply some of the facts that relate to my opinions below.  The presence or absence of any fact is simply that - and nothing more.   As stated, I have reviewed the materials as set out in Appendix D and assessed the facts and data contained therein in conjunction with the applicable industry standards for claim handling in the State of Florida.  The following summarizes pertinent facts as gleaned from review of the materials as set forth in Appendix D – all in order to provide some context for my opinions.

- On November 13, 2013 Pierce and Lois Mills were travelling on a public road, in their designated lane of travel after dark and within the applicable speed limit.

- A tractor trailer attempted to make a left hand turn across their lane of travel in the dark and violated their right of way causing a devastating collision.

- Lois Mills sustained catastrophic and life-threatening injuries which left her paralyzed until her death.  Pierce Mills also sustained serious injuries.

- The tractor trailer was being driven by Carl Therrel.

- Mr. Therrel and/or his wife Julie Spiers owned the tractor;

18

- They operated a business called Therrel Transport (collectively "Therrel").

- The trailer belonged to North Florida Diesel ("NFD").

- Great South Timber and Lumber ("GST") was a lumber company which identified tracts of timber and contracted with the property owners for land clearing and timber sales.

- NFD had contracted with to GST to perform the timber clearing operations on land near where the accident had occurred.

- NFD cleared the land and was under contract with GST to transport the timber to various locations.

- NFD subcontracted the timber transport portion of its agreement with GST to Therrel.

- Therrel used its tractor to pull a trailer owned by NFD loaded with timber to the designated location and then returned the empty trailer to the property being cleared by NFD under contract with GST.

- It was in the evening after dark on one such return trip that the accident occurred.

- The roadway was constructed in such a fashion that the tractor trailer had to make a sharply angled turn back against its original direction of travel to complete its return trip.

- Typically, Mr. Therrel returned during the day and an NFD representative would stop oncoming traffic for the tractor trailer to make the difficult turn.

- Mr. Therrel returned after dark in this instance and attempted to make the turn without traffic control assistance and the accident occurred.

- Therrel was insured with Progressive under a commercial automobile insurance policy with liability limits of $1,000,000 per occurrence (the Therrel policy)[14].

- The trailer owned by NFD was listed on the Therrel policy along with the Therrel tractor.

- The policy contained a very standard liability policy definition of an "insured" which rendered any person or entity who was vicariously liable for the actions of an otherwise defined "insured" also an "insured" to the extent of that vicarious liability.

- This is what is known in the industry as an "omnibus" insured – a person or entity which is granted "insured" status by definition rather than by being specifically named in the policy.

---

[14] Mr. Therrel and Ms. Spiers also had a personal automobile insurance policy with Progressive which is not at issue in this litigation ("the Spiers personal policy").

- NFD was also insured by Progressive under a commercial automobile insurance policy with liability limits of $500,000 per occurrence ("the NFD policy")[15].

- The NFD policy did not list either the involved tractor or trailer but afforded coverage for "non-owned autos" and was applicable to this loss as a result.

-  In addition to the standard omnibus insured definition of "insured" found in the Therrel policy, the NFD policy contained an additional endorsement expressly identifying GST as an additional insured to the extent of its vicarious liability for the actions of an otherwise identified insured under the policy.

- When the facts are applied to the policy language on the policies issued by Progressive, it is clear that GST was an "insured" of Progressive under both the Therrel policy and the NFD policy for GST's vicarious liability for Therrel and NFD.

- The loss was reported to Progressive by Therrel on or about November 14, 2013 and a claim was opened under the Therrel policy.

- The claim was immediately assigned to the Large Loss Litigation Department due to the catastrophic nature of the injuries sustained.

- On or about January 16, 2014, Progressive opened a claim under the NFD policy as well.

- On November 14, 2013 Progressive's manager instructed the assigned claim representative to perform an investigation and analysis as to whether any other persons or entities would be considered insureds under the policy.

- What followed was some investigation into the facts of loss, a conversation with Therrel and later NFD which identifies the facts of the relationships as identified above;

- And then exactly no attempts to investigate further - whether and to what extent GST may be deemed an insured - under the Therrel policy or the NFD policy for this loss.

- While Progressive's corporate representative has testified that they "continued to investigate" he could identify no actual investigative steps which were taken other than the conversations with Therrel (Julie Spiers) which occurred on November 15, 2013, and a telephone interview of Stacy Norman (the principal of NFD) on January 30, 2014.

- The file reflects and does not show any other actual *investigative steps* pertaining to the liability of GST or its status as an insured under either of the two Progressive policies at issue;

---

[15] The principals of NFD also had a personal automobile insurance policy with Progressive which is not at issue in this litigation ("the Norman personal policy").

- Further and similarly, the corporate representative could identify no other actual *investigative steps* pertaining to the liability of GST or its status as an insured under either of the two Progressive policies at issue;

- In the January 30, 2014 call, Progressive learned the first name of the contact at GST with whom NFD dealt, yet it made no efforts to contact GST in any fashion.

- Progressive did not attempt to obtain a last name or phone number.

- Progressive did not call GST's offices.

- Progressive did not attempt to write to GST until June 6, 2014 when it finally wrote a letter "To Whom It May Concern."

- By late January of 2014, when Progressive gained an understanding of GST's role in the logging business, Progressive was also aware of the catastrophic injuries sustained by Lois Mills and of the serious injuries sustained by Pierce Mills.

- Progressive knew and understood the facts pertaining to the loss event itself.

- As a result Progressive understood that Therrel faced a potential exposure well in excess of the combined $1,500,000 in available coverage.

- Indeed, Progressive sent Therrel an excess letter on December 31, 2013, at least as pertained to the Therrel policy.

- Logically, with this knowledge and understanding, Progressive is also charged with knowledge that any person or entity vicariously liable for Therrel would face the same catastrophic excess exposure.

- After initially incorrectly concluding that the NFD policy did not apply because it did not specifically list the involved trailer, Progressive retained coverage counsel, Jack Frost, to evaluate whether the NFD policy would be triggered by the facts of loss and the relationship of the parties.

- On November 19, 2013[16] counsel for the Mills sent Progressive a Letter of Representation which requested statutory insurance disclosures and stated that he (counsel) was "particularly interested in whether your insured had any sort of business relationship with the landowners or others who were clearing the land."

- Insurance disclosures in Florida require a sworn response within thirty days of the written request.

---

[16] Oddly, the claim file note reviewing this request is dated January 29, 2014, after which there is still no investigation or analysis regarding potential coverage for GST.

- The response must identify any and all potentially applicable policies, identify all insureds, identify any coverage issues, and any excess or umbrella coverage.

- By statute, a carrier is required to "immediately" amend its responses based upon any change in the responsive information.

- The responsive insurance disclosure (located within the file) has a date of December 3, 2013.

- It identifies only the Therrel policy with $1,000,000 policy limits and identifies only Julie Spiers, Carl Therrell [sic], Therrel Construction, Inc. and North Florida Diesel, Inc. as insureds.   GST is not identified as an insured.

- The NFD policy is not identified and no coverage issues are identified.

- There are no amendments or updates to this disclosure anywhere in the provided materials.

- On February 13, 2014, the claim handler on the NFD policy spoke with counsel for the Mills who informed her that he was looking into coverages for GST and would be sending them a letter.

- On February 21, 2014, an insurance agent who represented both Progressive and other carriers, "Todd" at Nature Coast Insurance Agency, contacted Progressive and explained that he also insured (and thus as an agent, represented) GST "who is an additional insured" on the NFD policy.

- He reported that GST had received a letter from an attorney regarding the loss.

- And yet, the files are devoid of any steps taken by Progressive to investigate further either the claims against GST, theories of liability against GST or GST's right to coverage under either or both of the Progressive policies.

- In fact, on March 3, 2014 the manager specifically instructed the claim professional that she "need[ed] to investigate the claim against Great South Timber to address any omnibus issue."

- That note was placed in the file at 2:56 PM.

- The next morning at 8:53 AM on March 4, 2014, with no intervening notes, investigation or analysis, the assigned claim professional responds "based on my conv w/ agent Great South did not own the property.  I/V trailer was not loaded at TOL so no omnibus other than N. Fla Diesel."

- The Progressive corporate representative has described this as "a mistake."

- And yet the mistake was never corrected.

22

- Progressive retained counsel for both Therrel and NFD to, apparently, assist in the investigation.

- It is hard to know exactly what the scope of the retention was because the corporate representative testified he did not recall counsel being retained and he did not know why they were retained before suit was filed.

- The produced file notes surrounding multiple redacted entries suggest that the attorneys were gathering facts and documents and reporting back to the claim professionals, essentially performing claim investigation functions.

- This is not an uncommon thing for carriers to do on large or complex claims – retain outside counsel to assist in the claim investigation.

- Later, the lawyers become involved in discussions with opposing counsel regarding the ultimate release language and who the released parties were to be, also typical claim adjusting functions in the pre-suit stages of a claim.

- And yet, Progressive never retained counsel for its third insured, GST.

- On or about April 17, 2014 Progressive transferred the Therrel policy claim file out of its Large Loss department and into what is known as its "Specialty Zone" along with the NFD policy claim file which had been in the Specialty Zone from the outset.

- Progressive also split the NFD policy claim file for further handling for liability and coverage.

- The Therrel policy claim file was never split.[17]

- As part of the file transfer, the newly assigned claim professional on the Therrel policy claim file performed a review of the file and entered a summary note on April 30, 2014 wherein he addressed coverage, liability, and damages.

- This is a very common file transfer activity.

- In the claim note - he notes that "coverage is in order but a full omnibus investigation remains."

- However, while that adjuster talked about coverage for NFD, he never conducted actual investigation into potential coverage for GST.

---

[17] This would appear to be a breach of Progressive's own internal policies and procedures which require a separate claim file be established for each Progressive insured. Progressive's corporate representative has indicated that procedure was inapplicable here and that instead the designated claim processionals on each claim were charged with protecting the interests of all insureds under the policy.

- Likewise, in his liability analysis he addressed NFD's vicarious liability and exposure but never mentions or addresses GST's.

- He does note an "omnibus concern":

  > "It would appear that the insured was under dispatch of North Florida Diesel, but the question is really who would we owe a release under this loss and not enough information is available under this fact pattern to determine same."

- And yet both his action plan and the claim files remain devoid of any actual investigation regarding GST, theories of liability against it and potential coverage under the policy.

- The only reference to coverage for GST was the notation that GST was insured by United Fire.

- This new Claim Professional spoke to counsel for the Mills for an injury update and counsel told him that a large portion of the matter would be determined by the relationship between Therrel and GST.

- And yet the claim files going forward are devoid of any additional investigation into the relationship between Therrel and GST.

- Repeatedly, the corporate representative when asked what investigation Progressive performed in response to the various events responded "the investigation continued";

- Yet, the only actual activity he could identify was retention of outside counsel Jack Frost to assist Progressive in evaluating coverage.

- The corporate representative could not say whether Mr. Frost was retained to specifically address coverage for GST or just the trigger of coverage under the NFD policy generally.

- My understanding is that Progressive has refused to allow the deposition of Mr. Frost, asserting privilege.

- On May 1, 2014 all of the various claim professionals, manager and perhaps some directors conducted a round table on the file where they discussed coverage, liability, and damages from the perspective of both policies.

- The relationship of the parties was again discussed, and GST was noted only as having coverage under the United Fire policy.

- It was determined that based upon the liability and damages tender of the combined policy limits was warranted.

- The expressed intent was to have Jack Frost convey the tenders; however, the ultimate tenders were conveyed by the Claim Professionals.

- On May 12, 2014, a tender letter was faxed to counsel for the Mills by the adjuster on the Therrel policy claim file.

- It enclosed a check for the $1,000,000 policy limits and stated it was on behalf of Julie Speirs, Carl Therrel and "any potential omnibus insureds."

- A proposed release was provided but the letter stated that "while a release is required, our tender is not conditioned on the use of any specific release."

- The enclosed release purported to release claims against Julie Spiers, Carl Therrel, Therrel Transport, North Florida Diesel, Inc., and Great South Timber and Lumber in exchange for the $1,000,000.

- No mention was made of the additional $500,000 in coverage under the NFD policy.

- On May 13, 2014 counsel for the Mills spoke to the Therrel policy Claim Professional and asked about the NFD policy.

- He was referred to the adjuster on the NFD policy.  There was also some unspecified discussion about necessary changes to the release.

- That same day, the Claim Professional on the NFD policy claim file sent a letter to counsel for the Mills referencing only the NFD policy and offering the $500,000 policy limit on behalf of NFD "and any potential omnibus insureds."

- Again, it noted that while a release was required, no specific release was mandated, and counsel was invited to contact Progressive to discuss changes.

- The attached proposed release purported to release claims against Julie Spiers, Carl Therrel, Therrel Transport, North Florida Diesel, Inc., and Great South Timber and Lumber in exchange for the $500,000.

- On May 20, 2014, after finding out about the tenders (from counsel for the Mills), United Fire wrote to Progressive requesting statutory insurance disclosures.

- Only on May 22, 2014, the assigned Progressive Claim Professionals first appear to give consideration to whether and what extent GST may be entitled to protections under the Progressive policies.

- They speculated that GST would more likely be entitled to coverage under the NFD policy than the GST policy, but determined to consult with counsel, Jack Frost.

- On May 27, 2014 Progressive spoke to United Fire and noted that United Fire had received a demand for its total combined policy limits.

- United Fire indicated they viewed their policies as excess to the Progressive policies and that at this point they had not retained counsel for GST.[18]

- The next day, after discussions with coverage counsel, the Progressive Claim Professionals charged with protecting the interests of all of their insureds concluded in a summary fashion that, since there was presently no complaint pending against GST alleging vicarious liability, nothing was owed to GST by Progressive at this point.[19]

- As noted earlier, on June 6, 2016 for the very first time, Progressive made an effort to make contact with GST.

- Progressive wrote a letter addressed "To Whom It May Concern" in reference only to the NFD policy.

- The letter purported to provide "an update" to GST with regard to a claim that "potentially involves Great South Timber and Lumber, LLC."

- They described the basic facts of loss.

- They provided three sentences of description of the injuries sustained by the Mills.

- They explained that Progressive afforded $500,000 to NFD and that they had tendered that policy to the Mills and requested a release of the various parties including GST but that the tender had not yet been accepted.

- They then inquired of GST whether it had retained personal counsel on its own behalf.

- Nowhere in the letter does Progressive explain that there was an additional $1,000,000 under a separate policy.

- Nowhere does it explain that, in fact, GST was an "insured" under both of these policies for this loss.

- Nowhere does it explain the potential for exposure to GST in excess of the combined limits.

- Nowhere is an actual evaluation of the claims provided.

---

[18] The primary layer of coverage has the obligation to retain counsel for mutual insureds.

[19] It bears noting that there was no complaint pending against Therrel or NFD alleging any sort of liability, vicarious or otherwise, and yet Progressive had engaged an investigation of potential claims against them, communicated with them, written to them, disclosed coverages pertaining to them, and retained counsel for them.

- Nowhere does Progressive explain that GST has a right to counsel or a right to contribute to the settlement efforts.

- Nowhere does it explain that, should suit be filed, Progressive would be obligated to defend GST.

- On or about June 13, 2014, opposing counsel indicated that he was considering accepting the Progressive combined policy limits for a release of all proposed parties, except GST.

- The retained counsel for Therrel and NFD became involved and facilitated adding additional releases to the list.

- At no point did Progressive retain counsel to participate in the discussions on behalf of GST or invite GST to participate.

- On or about June 17, 2014 opposing counsel sent a proposed release that excluded GST. Progressive reviewed it and found it acceptable.

- On June 18, 2014 Progressive responded to United's statutory insurance disclosure request disclosing the Therrel policy and listing the NFD policy as potential excess coverage.

- The NFD limits are not disclosed.

- The disclosure states that there are no coverage issues but identifies only Julie Spiers, Carl Therrel, Therrel Construction, LLC, and Therrel Transportation as insureds.

- GST is referenced as an insured nowhere.

- On June 26, 2014, Progressive contacted GST for just the second time in this claim, this time to reiterate their prior $500,000 offer under the GST policy and to ask GST again if it had hired its own counsel.

- Nowhere in the letter does Progressive explain that there is an additional $1,000,000 under a separate policy.

- Nowhere does it explain that, in fact, GST is an "insured" under both of these policies for this loss.

- Nowhere does it explain the potential for exposure to GST in excess of the combined limits.

- Nowhere is an actual evaluation of the claims provided.

- Nowhere does Progressive explain that GST has a right to counsel or a right to contribute to the settlement efforts.

- Nowhere does it explain that, should suit be filed, Progressive would be obligated to defend GST.

- Nowhere does the letter explain that Progressive intended to exhaust its limits on insureds and entities other than GST and that, once that settlement was consummated, it would take the position that it owed nothing to GST.

- Progressive determined to accept the release of its incomplete list of insureds, plus those requested to be added by counsel it retained for Therrel and NFD.

- It made no further attempt to negotiate even partial release of GST for its vicarious liability.

- It never requested that Plaintiff agree to accept $1.00 less than the full policy limits in exchange for a release of all except GST.

- It never offered to allow GST to contribute a portion of the $1,500,000 to preserve its defense rights under the Progressive policies.

- In July 2014 United Fire, as the excess carrier for GST requested the use of Progressive's liability investigative materials.

- Progressive was: "not keen on the idea" noting that "from our perspective Great South Timber has no relationship with Julie Spiers or Carl Therrel.  They are not likely an omnibus under this policy; however, North Florida Diesel would be an omnibus under this policy has its own non owned coverage under the dual loss as such they may have an interest in providing some information to the other carrier."

- United Fire ultimately gave up on seeking assistance from GST's primary carrier.

- The release was executed by the Mills on August 14, 2014.  Progressive thereafter took the position that it owed nothing to GST due to its policy limits exhaustion.

- Thus, when a complaint was filed by the Mills in November 2014 and defense was tendered to Progressive, Progressive denied the request, citing only policy limits exhaustion as a basis for the denial.

- The complaint alleged primarily vicarious liability against GST for both Therrel and BFD, but did include allegations of direct negligence for failure to provide a safe means of ingress and egress to the property.

- Clearly, but for the exhaustion of the Progressive policy limits, GST would have been entitled to a defense by Progressive for the entirely of the complaint, at least until the covered vicarious liability counts were resolved.

- United Fire stepped in, defended GST, the settled the Mills claims of the against GST.

28

- This action followed wherein United Fire, as the subrogee excess carrier for GST and standing in its shoes, seeks recovery for its defense and indemnification.

- The Amended Complaint includes claims for both Common Law Bad Faith and Statutory Bad Faith pursuant to multiple Civil Remedy Notices of Insurer Violation filed during the course of the litigation between the Mills and GST.

## EXPERT OPINIONS.

**Expert Opinion.  Predicate to each of the Following Opinions.**  Each of the following opinions is based, among other things,[20] upon my expertise as to commercial auto claims -  as a former or current (1) Commissioner of Insurance, First Deputy Commissioner of Insurance; Assistant Attorney General assigned on a full-time basis to the Department of Insurance (IDOI); and Administrative Law Judge[21] at the IDOI; (2) Chief Executive Officer of a major property casualty insurance organization, authorized to do business and doing business throughout the U.S., (3) General Counsel and Chief Lobbyist to the American Academy of Actuaries, Washington D.C.; (4) as one of 200 U.S. certified reinsurance arbitrators, where I sit from time to time as an arbitrator in binding arbitration in disputes between commercial auto insurers and their reinsurers, (5) as a most recent Elected  Member of the Florida House of Representatives where I have served as a Member and   Vice Chairman of the Insurance Committee and have had responsibility for legislation relating to commercial auto insurance and commercial auto insurers' obligations; and as a Member of the Florida House's Commerce Committee, the upstream parent of the Insurance Committee; through which all insurance legislation must pass; (6) as an elected member of the Executive Committee of the National Association of Insurance Commissioners (NAIC) where I had responsibility for the "C" Committee, a/k/a the Property Casualty Committee, which had jurisdiction over commercial auto matters nationally; and (7) all as measured in custom and practice in the industry.

*Conclusion as to this Expert Opinion.*    In entering my opinions in this matter, I have used my skills, knowledge, training, education, expertise, experience and working knowledge of the specific matters at issue.

**Expert Opinion: Obligations and Responsibilities.**  An insurer doing business in Florida has various obligations as responsibilities.  Some of those are as follows:

- An insurance carrier owes certain fiduciary duties to its insureds in the State of Florida.

- Those duties have been articulated by various Florida Courts and find additional support in the Adjuster Code of Ethics and the Unfair Claim Practices Act.

- Under both the Common Law and the Statutory causes of action, the duties, and obligations of the carrier vis a vis its insured remain the same.

---

[20]See statements as to my background and other matters I utilized in entering these expert opinions as set forth elsewhere in this Report.
[21]Then known as a hearing officer.

- In essence, a carrier must act fairly and honestly and with due regard for the interests of its insured.

- It must refrain from placing its interests above those of its insured;

- It must settle claims against its insured where under all of the facts and circumstances it can and should do so.

- In the exercise of these duties, the carrier must keep its insureds advised of opportunities to settle the claims and must advise its insureds of the potential for an excess exposure should the matter proceed to trial.

- In doing so, it must also advise its insureds of those steps the insured may take in order to protect itself from that potential for excess.

- Where coverage issues are involved, the determination of good faith involves an analysis of the carrier's actions taken to resolve the coverage issue.

- The carrier must exercise the same degree of care and diligence as a person of ordinary care and prudence would exercise in his or her own business.

- It must act in good faith and with due regard for the interests of its insured.

- A carrier is required by Florida law to advise the insured of opportunities for settlement.

- A carrier must further advise its insured(s) of the probable outcome of litigation including an assessment of liability and damages; the potential for excess judgments; and non-covered elements of the claims to which the insured is exposed.

- Where there are multiple insureds - a carrier owes the same fiduciary duties and obligations to each of its insureds in equal measure.

- An insurer may not place the interests of one insured above the interests of another.

- An insurer may not simply indiscriminately exhaust its policy limits in settlement of the claims against some insureds to the exclusion of others.

- A carrier must use sound reasoned settlement practices in exhausting its limits so as to minimize any excess exposure to its insured.

- A primary carrier owns the same duties and obligations to an excess carrier as it owes to their mutual insured.

- An excess carrier stands in the shoes of a mutual insured relative to the duties and obligations the primary carrier owes to the mutual insured.

30

- The Adjuster Code of Ethics governs the daily conduct of a claim professional handling a claim on behalf of his or her insured.  Pursuant to this Code, an adjuster

  o shall treat all insureds equally;

  o shall not approach investigations, adjustments, and settlements in a manner prejudicial to the insured;

  o shall make truthful and unbiased reports of the facts after making a complete investigation;

  o shall handle every adjustment and settlement with honesty and integrity;

  o upon undertaking the handling of a claim, shall act with dispatch and due diligence; and

  o shall not undertake the adjustment of any claim concerning which the adjuster is not currently competent and knowledgeable.

**Expert Opinion: Progressive Breached its Obligations and Responsibilities.**  Based upon my review of the various file materials, which are summarized in pertinent part above, it is my opinion that, under the totality of the circumstances, Progressive failed to meet its fiduciary obligations and failed to comply with applicable industry standards relative to the claims of Pierce and Lois Mills against Great South Timber and Lumber.

The first steps in any claim investigation must be to identify who are the insureds which require protection.  The voluminous claim materials produced by Progressive uniformly establish one undeniable fact – Progressive never appropriately undertook and completed a coverage evaluation with regard to GST.

- There are no attempts to actually contact GST to obtain necessary information to correctly analyze coverage.

- In February 2014 Progressive made an incorrect initial coverage analysis under the NFD policy determining no coverage for GST.

- Instead Progressive relied upon anecdotal and incomplete speculation by its other insureds as to GST's role in the claim and then arbitrarily concluded GST was not covered.

- Although Progressive's corporate representative acknowledges that this was a mistake, the subsequent claim handling never corrected that mistake.

- At the same time Progressive completely failed to analyze the Therrel policy for coverage for GST.

The failure to investigate and identify GST as an insured was clearly in reckless disregard for GST's interests – Progressive knew it needed to investigate and analyze, yet it did not.

- In November, a manager inquires as to other omnibus insureds – yet Progressive failed to investigate and timely identify GST as an insured.

- In March, a manager notes the file that they need to investigate claims against GST specifically and address any omnibus insured issues – but again Progressive never follows through with investigation.  Instead Progressive concludes with no investigation or legal analysis that GST has no exposure because the trailer was not loaded at the time of the accident.

- In April, the newly assigned adjuster notes "coverage is in order but full omnibus investigation remains" – yet the questions appear to be limited to whether Progressive needs a release of NFD – Progressive gives no consideration as to GST whatsoever.

Progressive also affirmatively misrepresented the coverages under its policies.  The November 2013 insurance disclosure on Therrel policy does not disclose GST as an insured and was never later updated to disclose GST as an insured as required by Statute.  Progressive also failed to ever disclose GST as not only an "omnibus" insured on the NFD policy, but a specifically listed Additional Insured.

A carrier's duties to its insureds are independent and nondelegable.  Yet once Progressive confirmed GST has at least $1,000,000 in coverage with United Fire it quite apparently discounted any need to protect GST or complete a coverage assessment as to GST under either Progressive policy. Thus, when counsel for the Mills sought to exclude GST from the release, Progressive acquiesced without protest.

- It never offered GST the opportunity to contribute a portion of the policy limit payment so as to preserve a defense obligation.

- It never attempted to save $1.00 of the policy limits to preserve its defense obligations.

- It made no effort whatsoever to protect or advance the interests of GST at all.

- In fact, Progressive actively ignored contact efforts from GST's agent in June 2014.

Clearly, Progressive was interested only in tossing its limits and washing its hands of the claim to the detriment of GST and GST's excess carrier, thereby saving itself the costs of defending its insured, GST.  Progressive then went so far as to overtly place its own interests above those of its insureds in July 2014 when it refused to share information and its liability investigation with GST's excess layer of coverage - United Fire.

A carrier owes each of its insureds the same fiduciary duties and may not place the interests of one insured above those of another.   Yet Progressive engaged in a common bad faith practice – it ignored the interests of its unnamed insured and gave priority treatment to those in whose names

32

the policies were issued.  Thus, Progressive assigned defense to its other insureds but not GST and continued to pursue the interests of its other insureds while wholly ignoring the interests of GST. Counsel assigned to the other insureds diligently pursued their clients' best interests to the detriment of GST's.  Had Progressive assigned counsel to GST at the same time, presumptively that counsel would have worked toward obtaining a release of GST rather than a settlement which explicitly excluded GST.

- Counsel for GST could have requested preservation of $1.00 of Progressive's limits.

- It could have advised GST to offer to contribute some of its own money to the $1,500,000 and thereby preserve the defense obligation of Progressive.

Only after decision to tender was made did Progressive finally ask itself if GST was an insured under NFD policy and if it had obligations to GST.  (There was no consideration of obligations under the Therrel policy).  Even at this late date, the coverage adjuster did not know whether and to what extent it insured GST.  After discussion with the coverage attorney (Frost) Progressive then affirmatively and erroneously determined that it had no obligations to GST at that time because there was no complaint pending with vicarious liability allegations.  This is quite apparently a complete misunderstanding by Progressive of the duties and obligations owned to any insured and is perhaps a misguided misapplication of the "duty to defend" standard.

A carrier is required to investigate and evaluate all potential claims against its insureds arising out of any given loss and to proactively seek to protect against them, whether they have been affirmatively asserted in litigation or not.  In fact, Progressive did exactly that with regard to Therrel and NFD.  It simply ignored its obligations to GST.

As a result of Progressive's complete lack of investigation and analysis as to coverage for GST, Progressive can be seen to violate its obligation and responsibility to act in good faith and fair dealing toward GST in its claims handling.

Communication with insureds is key, yet there are exactly no attempts by Progressive whatsoever to communicate with GST in any fashion until after any possible opportunity to settle on GST's behalf has passed.  If there are any such communications, they have not been produced and are not documented in the claim notes.  As noted above, Progressive also affirmatively ignored contact attempts by GST's agent.

As a result, Progressive never timely notified GST of its potential excess exposure in this matter. In fact, Progressive never notified GST of its actual excess exposure at all because its only communications with GST after the tender letters were with regard to the NFD policy only.  The corporate representative stated that there should have been separate letters addressing the Therrel policy, but there were none.

Nor did Progressive timely notify GST of ongoing settlement discussions.  Progressive's only efforts at communication with GST about settlement was to inform GST after the fact that tenders had been made but not accepted and later that settlement was not possible.  It communicated only

that GST might wish to retain independent counsel to address United's coverages.   The correspondence is wholly deficient.

- It references only the NFD policy.

- It never acknowledges GST's status as an "insured" under either policy.

- It never provides an evaluation of the actual claims.

- It never advises of an excess exposure over the combined policies.

- It never notifies GST of its right to counsel or to contribute or otherwise participate in settlement discussions.

Progressive likewise never notified GST before agreeing to exhaustion of its limits that in doing so it would then take the position that it owed nothing to GST, including a defense.

Investigation into liability and damages is also a basic cornerstone of good faith claims handling. Yet Progressive never made any investigation into the potential liability of GST whatsoever.  Its only half-hearted commentary on the subject was a reflexive refusal to investigate by a claims handler who was instructed to investigate and essentially replied "we don't need to because the trailer wasn't loaded at the time."

*Conclusion to This Expert Opinion.*  Having taken the easy way out by exhausting its available policy limits on behalf of a limited subset of its insureds, Progressive then denied any benefit to its remaining insured, GST, by claiming policy exhaustion as a basis for refusing to defend GST when litigation proceeded.  While exhaustion of limits is normally a defense to a continuing duty to defend under the contract, the carrier may not exhaust in breach of its obligations of good faith and fair dealing without exposing itself to bad faith damages including that of defense costs.  Here, Progressive acted in bad faith toward GST.[22]   In so doing, Progressive did not in good faith eliminate its duty to defend GST by paying its policy limits on behalf of a limited subset of its insureds.

Progressive placed its own economic interests above the economic interests of Great South Timber by not helping GST to preserve its right to a legal defense under either of the Progressive policies.

Progressive unfairly discriminated against GST by not providing it with legal defense counsel when Progressive provided legal defense counsel to other insureds of Progressive.

Progressive failed to inform GST of what it could have done to preserve its right to a legal defense under either of the Progressive policies before Progressive exhausted its policy limits.

**End of My Expert Opinions.**  This ends my expert opinions in this matter.

---

[22] In general, the determination of whether a carrier has acted in good or bad faith must be made upon an evaluation of the totality of the circumstances.   I have done so here.

## IV.  MORE GENERAL EXPERTISE
## TO RENDER THESE EXPERT OPINIONS

In addition to my specific expertise relating to this case and set out above under Section II of this Report, I set out below my more general expertise against which I enter the expert opinions in this case.  The below material should be read together with Section II above and as well together with my attached Curriculum Vitae, including referenced websites (See Appendix A).

A.  **Formal Education.**

- **1.  Bachelor's Degree in Mathematics.**  I hold a bachelor's degree in secondary mathematics education from the University of Northern Iowa;

- **2.  Master's Degree in Psychology.** I hold a master's degree in educational psychology from the University of Hawaii; and

- **3.  Juris Doctor's Degree.**  I hold a J.D. degree from the University of Illinois.

B.  **Licensure and Certification.**

- **4.  Certified Reinsurance Arbitrator.**  I am certified by ARIAS as one of about 400 U.S. certified reinsurance arbitrators;

  **Certified Insurance Arbitrator.**  I am also certified by ARIAS as one of about 400 *insurance arbitrators,* where I sit in disputes in matters of insurer versus insurer.

- **5.  Admitted to Practice Law.**  I am licensed and admitted to practice law upon examination in the states of Iowa, Illinois, and Florida; and

- **6.  Admitted to Practice before the U.S. Supreme Court.**  I am also admitted to practice before the U.S. Supreme Court.

C.  **Insurance Expert.**

- **7.  Expert Witness.**  I have served as an expert witness in several cases throughout the U.S. and have been qualified at trial as an expert witness in about 20 states.

- **8.  Insurance Consultant to the U.S. Attorney:**  By way of example of my various assignments, I have been retained in the past by the U.S. Attorney, the Middle District of Florida, as an insurance consultant in a complex civil insurance matter.

- **9.  Insurance Consultant to the U.S. Department of Justice (Main).**  Similarly, I have also been retained by the U.S. Department of Justice as an insurance consultant in a complex insurance case.

- **10.  Expert Witness: The United States Air Force.**  I have also been retained and testified as an expert witness for the United States Air Force in a complex commercial auto matter in connection with pollution liability.

- **11.  Expert Witness: on Behalf of or Before Various Departments of Insurance.** I have also been retained as an expert witness by the: (i) FL OIR/ Division of Liquidations and have testified on their behalf in Florida federal and state court, (ii) the Arizona Department of Insurance/ Division of Liquidations and testified on their

36

behalf.  In addition, I have testified as an expert before the Florida, Nevada, Oklahoma, South Dakota, Wisconsin, and Texas Departments of Insurance.

**D.   Industry Background:  Reinsurance Arbitrator.**

- **12.   Reinsurance Arbitrator: Commercial Auto Cases.[23]   November 2003 to Present.**  My background includes extensive exposure to the various reinsurance mechanisms and relationships.  Along these same lines and as indicated above, I am a certified ARIAS-US reinsurance arbitrator (see immediately below) and have sat as an arbitrator in cases between commercial auto insurers and their reinsurers.   The relevance of this experience to this case is that reinsurers have substantial influence on their underlying commercial auto insurers.

  As of November 2003, I was certified by AIDA Reinsurance and Insurance Arbitration Society, United States ("ARIAS-US") as an arbitrator for reinsurance and insurance matters.  Today, there are about 200+ individuals so certified by ARIAS in the United States.

  ARIAS-US certifies knowledgeable and reputable professionals for service as panel members in reinsurance and insurance arbitration matters.  The organization's criteria for certification are as follows:

  - 10 years of significant specialization in the insurance/reinsurance industry;

  - Arbitration experience – must have completed appropriate credited ARIAS seminars;

  - A member in good standing of ARIAS-US; and

  - Appropriate endorsement from existing members.

**E.   Industry Background in General**

- **13.   CEO of a Major Property Casualty Insurance Entity Regulated Throughout the US; President and Chief Executive Office of the National Council on Compensation Insurance, 1990 – 1998**.  NCCI is one of the larger and more pervasive U.S. insurance organizations.  During my tenure as President and CEO, NCCI had (and continues to have) responsibility to accurately price and file pricing for some $15 billion of workers' compensation insurance in about 40 states throughout the U.S.  NCCI prepared proposed premium filings for regulators to approve by extracting key data from its 600-member insurance companies and then used that data to project necessary premium changes.  NCCI accomplished this mission through some 1,000

---

[23] When I use the term "commercial auto" insurance in this Section IV, it should be read together with my expertise (i) set out earlier and (ii) in my CV.

employees of which approximately 600 were professionals.  NCCI had annual revenues of $140 million.

**Doing Business Throughout the U.S.:  Insurance Program.**  As CEO of NCCI, I had daily exposure and responsibilities to the various state Departments of Insurance.  This included compliance with the Insurance Codes of the various states and the administrative regulations as to insurance as promulgated by the related Departments of Insurance.

**Claim Practices.**  In addition, and relevant to this case, NCCI had a vested interest in member insurer claim practices in that the industry's reputation for fair underwriting and defense and coverage practices ultimately impacted regulatory attitudes toward NCCI's premium approval process.

**Industry Standards of Practice.**  While President and CEO of NCCI, I visited and physically toured and reviewed in excess of 400 insurance companies and gained direct exposure to the procedures and processes and standard industry practices of the U.S. insurance community and its claim practices.  I have had extensive exposure to insurer practices and procedures in all lines of insurance, including commercial auto insurance.

**Familiar with this State's Insurance Regulatory Scheme.**  While CEO of NCCI, it was (and remains) (i) licensed to do business throughout the U.S.  In that capacity, my company, NCCI was subject as well to the regulatory scrutiny of the various state DOIs, as well as being subject to all applicable provisions of the various state's Insurance Codes.  NCCI was also subject to state and federal jurisdiction.  I am familiar with the regulatory and statutory scheme that is brought to bear on the commercial auto insurance matters at issue in this case.

- **14.  General Counsel and Director of Government Relations to the American Academy of Actuaries (Washington D.C.), 1980 – 1983.**  I served as General Counsel and Director of Government Relations for the American Academy of Actuaries, including advising on admissions, discipline, federal antitrust and general corporate law.  I represented the 20,000-member professional organization before Congress (e.g., Senate Committees on Banking, Commerce, Finance and Labor, and House committees on Education, Labor, Energy, and Ways and Means) and the various federal regulatory agencies.

  **Commercial Auto Insurance Companies and the Academy.**  The Academy is the professional organization of actuaries and includes qualified actuaries from all disciplines and all forms of insurers.  Academy members included affiliation with virtually every commercial auto insurance company in America.  The Academy's Board of Directors was likewise made up of leading insurance company executives from such companies.

- **15.  Risk Metrics Corporation.**  I co-founded this Florida based information company in 1998.  Risk Metrics (including Datalister, Inc.) gathers and sells public data relating

to property casualty insurance to a wide range of insurance-oriented customers, including insurance agents.  A number of years ago, I sold my interest in this corporation.

- **16. Attorney in Private Practice.**  As an attorney in private practice, I represented a number of insurer interests and became familiar with applicable regulatory and industry standards of practice.  Those interests included the position of Iowa Counsel to the Property Casualty Insurance Association of America (PCIAA).

     **Commercial Auto Insurance Issues.**  Those interests also included intimate involvement with commercial auto insurance, as counsel to the:

     Property Casualty Insurers Association of America (PCIAA - IA), some of whom but not all of whom – sold commercial auto insurance;

     Professional Insurance Agents of Iowa, whose agents sold commercial auto insurance; and

     The Iowa Association of Life Underwriters (life, health, and annuity insurance agents).

     Specific duties as counsel at the PCIAA (whose members wrote commercial auto coverage) and the Professional Insurance Agents of Iowa (who sold, among other coverages, commercial auto insurance) and the Iowa Association of Life Underwriters (life, health and annuity insurance agents) included in-depth familiarity with commercial auto insurers, their agents and their defense and coverage practices.

## F.  Regulatory

- **17.  Commissioner of Insurance, Iowa 1986 – 1990.**  As Insurance Commissioner appointed by Governor Terry Branstad in July 1986, I was responsible for the regulatory oversight of all insurance companies, agents and brokers authorized to conduct business in the state of Iowa.  My agency was responsible for solvency oversight, insurance company examinations, financial and accounting matters of insurance companies, consumer protection, agent and broker licensing, and oversight of commercial auto insurance company practices, including defense and coverage and pricing practices.  In particular, that oversight included the responsibility of overseeing practices of commercial auto insurer defense and coverage and claim and rate making practices.  In addition, I oversaw the state regulation of the securities industry with Iowa's Superintendent of Securities reporting directly to me.

     **Regulatory Oversight:  Commercial Auto Insurer Practices.**  In addition, as Insurance Commissioner, my responsibilities included oversight over the education, licensing, discipline and general supervision of all commercial auto insurance

companies in the state.[24]  I am very familiar with the responsibilities and applicable obligations that come to bear upon commercial auto insurance companies.

**Regulatory Oversight:  Commercial Auto Insurance Claims Settlement, Including Defense and Coverage issues.**  As Insurance Commissioner, I also had day-to-day responsibility to assure that all underwriting and defense and coverage practices carried out by commercial auto insurance companies doing business in the state met their duties, obligations and statutory and regulatory responsibilities as they priced their policies and underwrote policies and settled cases, including obligations as to providing a defense and coverage matters.

**Financial Examination of Commercial Auto Insurance Companies.**  As Insurance Commissioner, I directed and oversaw the examination of all insurance companies authorized to do business in the State of Iowa.  Those examinations included focus on both financial matters (so called triennial examinations of insurers – of which well over 100 such examinations were conducted while I was Commissioner) and examinations of specific complaints about insurers (so called Market Conduct Examinations - well over 50 such exams were conducted while I was Commissioner).

**Market Conduct Examinations of Commercial Auto Insurer Pricing and Defense and Coverage Practices.**  Market Conduct Examinations focused on marketplace issues such as those at issue in this case, specifically examining commercial auto insurance companies as to compliance with their claim and coverage practices.  Concurrent with such exams, I personally reviewed and approved the final Examination Reports before they were issued.

In addition, in many of these instances, I visited the subject commercial auto insurer before the Examination Report was issue, including walking the floors of such insurance companies – reviewing their effected operations firsthand.   These exams were carried out applying the criteria set forth in the Market Regulation Handbook, as authored by all the Commissioners of Insurance throughout the U.S., including Florida's  Commissioner.  The Handbook is used by every DOI in the U.S., including Florida.

**Prosecution of Commercial Auto Insurance Companies.**   As Insurance Commissioner, I employed a full-time team of lawyers who fielded consumer complaints relating to all areas of commercial auto insurance company operations.  Indeed, many of these complaints, as well as results of Market Conduct Examinations, resulted in formal action under the state's Administrative Procedures Act.  From time to time, I served as the Administrative Law Judge, f/k/a/ the Hearing Officer - as to such matters.

**Major Insurance State.**  Iowa has about 1,000 authorized property and casualty insurance companies,[25] many of whom write commercial auto insurance and over 500

---

[24] Who held an insurance agent's license with authority to sell commercial auto insurance.
[25] During my tenure as Commissioner.

life insurance companies and an unusually large number of domestic insurance companies and as such, insurance regulation in that state is a serious job.

**Familiarity with State Insurance Regulation.**  As Insurance Commissioner in Iowa with interaction with Florida Insurance regulators, as a member of the NAIC with frequent interaction with the FL-OIR and as CEO of NCCI, I am familiar with the regulatory scheme in place in Florida.

- **18.   National Association of Insurance Commissioners (NAIC), 1986 – 1990.**  Concurrent with my service as Iowa Insurance Commissioner, I served as a member of the NAIC.  The NAIC is an organization of the Insurance Commissioners of all 50 states and meets quarterly in locations throughout the U.S. to consider and evaluate national insurance issues.  The FL-OIR is a sustaining member of the NAIC and active in the organization.  Further, the organization is professionally staffed with more than one hundred personnel.  The organization is based in Kansas City, Missouri.  The NAIC considers all major insurance issues and then promulgates model insurance laws and regulations, which are then routinely (but optionally) adopted at the individual state level, including matters relating to commercial auto insurance.

**NAIC Chairmanships – Chairman of the Midwest Zone.**  I was elected by my fellow Insurance Commissioners from the Midwest Zone (composed of the Midwest states, constituting about one quarter of all of the states) to provide leadership and representation of the Midwest before the balance of the states.  This position included a position on the Executive Committee of the NAIC as well as major responsibilities relating to the assignment of states (and their related examiners) to specific examinations, both triennial and Market Conduct.

**NAIC Leadership:  Member of the Executive Committee: Oversight over the Property Casualty (so-called "C" Committee).**  I also served as an elected member of the Executive Committee of the NAIC, the body that served as the steering committee of the organization, providing leadership between full membership meetings and providing recommendations to the full membership as to complex or politically charged issues within the organization.

**Property Casualty Committee.**  This position included oversight over the Property Casualty - Committee (so called "C" Committee), which had nationwide responsibility over most all aspects of commercial auto policies and their insurers.  That Committee's mission statement is as follows:

" … to monitor and respond to problems associated with the products, delivery and cost in the property/casualty insurance market and the surplus lines market as they operate with respect to individual persons and businesses. The Committee also is to monitor and respond to problems associated with financial reporting matters for property/casualty insurers that are of interest to regulatory actuaries and analysts and to monitor and respond to problems associated with the financial aspects of the surplus lines market."

41

**Other NAIC Chairmanships:**  I also served in a number of NAIC capacities.  My service on the following committees has been helpful in this matter:

- Member, the Blanks Committee
- Member, Guarantee Fund Committee
- Member, Rehabilitator and Liquidators Committee
- Member, Casualty Actuarial Committee
- Member, Commercial Lines Committee
- Member, Valuation of Securities Committee,
- Member, International Insurance Relations Committee
- Member, Accounting Practices and Procedures Committee and
- Member, State and Federal Legislative Committee.

**Ongoing Regulatory Involvement.**  In the years since leaving the regulatory ranks, I have continued to be closely involved with the NAIC and the regulatory community.  As President and CEO of NCCI, I was in regular attendance at meetings of the NAIC and continue to attend these meetings and to be actively engaged with the regulatory process.  Included in this attendance were my observations at the NAIC of the regulation of the industry.

- **19. First Deputy Commissioner of Insurance, Iowa 1976 – 1978.**  As First Deputy Insurance Commissioner, I was responsible for the regulatory oversight of all insurance companies, agents and brokers authorized to conduct business in the state of Iowa.  I was responsible for solvency oversight, insurance company examinations, financial and accounting matters of insurance companies, consumer protection, agent and broker licensing, and oversight of commercial auto insurance company practices, including claim, defense, and coverage practices.  In particular, that oversight included the responsibility of overseeing practices of commercial auto insurer claim and coverage practices.

**Regulatory Oversight:  Commercial Auto Insurer Practices.**  In addition, as First Deputy Insurance Commissioner, my responsibilities included oversight over the education, licensing, discipline, and general supervision of all COMMERCIAL AUTO insurance companies in the state.  I am very familiar with the responsibilities and applicable obligations that come to bear upon COMMERCIAL AUTO insurance companies.

**Regulatory Oversight: Commercial Auto Insurance Claims Practices, including Coverage and Claim Issues.**  As First Deputy Insurance Commissioner, I also had day-to-day responsibility to assure that all claim and coverage practices carried out by commercial auto insurance companies doing business in the state met their duties, obligations, and statutory and regulatory responsibilities as they settled cases.

**Financial Examination of Commercial Auto Insurance Companies.**  As First Deputy Insurance Commissioner, I directed and oversaw the examination of all

insurance companies authorized to do business in the State of Iowa, including commercial auto insurers. Those examinations included focus on both financial matters (so called triennial examinations of insurers – of which well over 50 such examinations were conducted while I was First Deputy Insurance Commissioner) and examinations of specific complaints about insurers (so called Market Conduct Examinations - well over 50 such exams were conducted while I was First Deputy Insurance Commissioner; see the discussion that follows). Florida uses the same Financial Examiners Handbook as Iowa applies the same criteria in judging insurers admitted in Iowa.

**Market Conduct Examinations of Commercial Auto Insurer Claim and Coverage Practices.** Market Conduct Examinations focused on marketplace issues such as those at issue in this case, specifically examining commercial auto insurance companies as to compliance with their defense and coverage practices. Concurrent with such exams, along with the Commissioner, I personally reviewed the final Examination Reports before they were issued. In addition, in many of these instances, I visited the subject commercial auto insurer before the Examination Report was issue, reviewing their effected operations firsthand.

**Prosecution of Commercial Auto Insurance Companies.** As First Deputy Insurance Commissioner, I oversaw a full-time team of lawyers who fielded consumer complaints relating to all areas of commercial auto insurance company operations. Indeed, many of these complaints, as well as results of Market Conduct Examinations, resulted in formal action under the state's Administrative Procedures Act. From time to time, I served as the Administrative Law Judge, f/k/the Hearing Officer - as to such matters.

- **20. Iowa Assistant Attorney General Assigned to the Insurance Department**, 1975-1976; serving as the Department's General Counsel. As Assistant Attorney General, I had departmental prosecutorial responsibilities for violations of the Insurance Code under the state's APA act including those committed by commercial auto insurance companies. The Attorney General responsibility also included issuing Attorney General Opinions as to the construction of insurance laws and regulations.

- **21. Legal Counsel to House of Representatives.** As legal counsel to the Iowa House of Representative (1975 session), I provided counsel on all relevant caucus issues and provided the following support:

  - Researched pending legislation,
  - Prepared memorandums in support of proposed legislation,
  - Provided legal advice, and
  - Participated in bill drafting, including that relating to insurance matters.

- **22. Lecturer at the Bar Review School**, **authoring and delivering the Insurance Course** to students studying for the Iowa Bar Exam (from about 1985- 1991). I was invited to provide the insurance content review material and lecture for the insurance section of the bar review course in Iowa. Included in this lecture was extensive law

43

applicable to the interpretation applicable to commercial auto insurance companies including their claim practices.  I authored this material and provided this lecture to students studying to pass the bar for about six years, until accepting the position of President and CEO of NCCI in Florida.

- **23. Chief of Staff:  U.S. Congress.**  I served as Chief of Staff at the U.S. Congress in Washington D.C. to an Iowa Congressman for about a year.  Among others, I participated in legislative drafting of insurance and reinsurance legislation.

- **24.  Expertise:  Elected Member of the Florida House of Representatives:  Vice Chairman and Member of the Insurance and Banking Committee; Vice Chair of the Civil Justice Subcommittee**.  In addition, I have gained background as to insurance policy matters during my service as an elected member of the Florida House of Representatives (elected in 2010 and re-elected in 2012 and 2014 and 2016 through 1/2019, at which time, I was term limited).  In particular, I served as Vice Chairman and as a member of the House Insurance Committee, whose jurisdiction includes legislative oversight over all of the insurance transactions in the state, including issues relating to among others, policy language and insurer defense and coverage and pricing practices of commercial auto insurers and their products.

- **25.  Expertise:  Vice Chairman and Past Member of the Florida House Civil Justice Subcommittee**.  In addition, I have gained background as to insurance policy matters during my service as an elected member of the Florida House, where in past, I have served as Vice Chairman and as a member of the House Civil Justice Subcommittee, whose jurisdiction includes the law as it relates to insurer good faith (and bad faith) among other related matters.

- **26. Insurance Lecturer: Florida State University College of Law.**  For a number of years, I have lectured at the Florida State University College of Law's Insurance Course, providing content as to the Florida Legislature's insurance legislation along with overall insurance and insurance regulation information.


**END OF THIS REPORT**


Signed electronically and dated this 1st day of July 2020


*William D. Hager*

William D. Hager

**APPENDIX A**

**CURRICULUM VITAE**

**WILLIAM D. HAGER**

**WILLIAM D. HAGER**
**CURRICULUM VITAE**
**(to be read together with https:/www.expertinsurancewitness.com)**

**PRESIDENT, INSURANCE METRICS CORPORATION**
BOCA RATON, FLORIDA - JANUARY 2000 to PRESENT

Mr. Hager formed Insurance Metrics Corporation in early 2000. The focus of this Corporation is three-fold:

1. The provision of reinsurance arbitration service,
2. The provision of expert insurance witness services, and
3. The provision of non-litigation insurance consulting.

**CERTIFIED REINSURANCE ARBITRATOR**

Certified by ARIAS (AIDA Reinsurance and Insurance Arbitration Society) as one of some 400+ certified reinsurance arbitrators in the U.S. ARIAS certifies qualified arbitrators and serves as a resource for parties involved in related disputes. ARIAS provides procedural guidelines, best practices and a code of ethics for its members. Certified arbitrators must be knowledgeable and reputable and meet minimum criteria as follows:

1. Industry Experience. At least 10 years of significant specialization in the insurance/reinsurance industry;
2. Arbitration Experience. Completed at least three ARIAS conferences or workshops; and
3. Member of ARIAS. Be an individual member in good standing of ARIAS.

**PRACTICING ATTORNEY AT THE HAGER LAW FIRM,**
Boca Raton, Florida.
Practice limited to insurance and reinsurance matters.

**ELECTED MEMBER OF THE FLORIDA HOUSE OF REPRESENTATIVES**
NOVEMBER 2010 to 2018, term limited as of January 1, 2019.

Mr. Hager was first elected in November 2010 to a two--year term to the Florida House of Representatives in Tallahassee Florida and re-elected to that same position in 2012, and again in 2014 and 2016. Hager represented House District No. 89, which consists of the South and Central beach communities of Palm Beach County. Cities represented in Palm Beach County include Boca Raton, Boynton Beach; Briny Breezes; Delray Beach; Town of Gulfstream; Highland Beach; Hypoluxo; Lantana; Manalapan; Ocean Ridge; the Town of Palm Beach; the Town of West Palm Beach and Singer Island. The District encompasses about 170,000 Floridians. Some

of the Legislative Committees Hager serves or has served on are the following, all by appointment by Speaker of the House: Insurance and Banking; Judiciary (parent committee); Civil Justice Subcommittee; Taxation: Charter Schools and Commerce, among others.  Hager has also chaired Judiciary Appropriations, consisting of some $5 billion in annual appropriations for Florida's judicial system, including all of the courts and public defenders and prosecutors and prison system and the Attorney General's Office.

### PRINCIPAL, COMP PREMIUM WIZARDS
**Website:  https:/www.comppremiumwizards.com**
NOVEMBER 2008 to PRESENT

Workers' compensation consultation services are offered for high risk industries such as construction, mining, and hazardous waste, as well as professional employer organizations (PEOs). Audits, the workers' comp classification system, e-mod analysis, high deductibles, retros, and scheduled ratings are analyzed by Mr. Hager and skilled actuaries who are highly experienced in workers' compensation.

### DEPUTY MAYOR (2004-2005) AND CITY COUNCIL MEMBER
CITY OF BOCA RATON, FLORIDA - APRIL 2002 to 2009

Mr. Hager was elected to a two-year term on the Boca Raton City Council, effective April 1, 2002. During his successful first term Council Member Hager focused on the city budget, quality of citizen services, increased educational opportunities and development plans. He was reelected to a second two-year term without opposition, effective April 1, 2004. At the same time Councilman Hager was also appointed Deputy Mayor, and he held this position for one year until 2005. Mr. Hager was subsequently re-elected to a third term of office in March of 2006, also without opposition, with that term running through March of 2009. As City Councilman and Deputy Mayor, Mr. Hager participated in the oversight of the Boca Raton City Government. He served as an elected member of the Boca Raton City Council through early 2009.

### CENETEC, L.L.C.
BOCA RATON, FLORIDA - JANUARY 2000 to JANUARY 2002

In early 2000, Mr. Hager co-founded Cenetec along with a group of entrepreneurs serving as its CEO and Chairman of the Board. Cenetec served as a for profit accelerator designed to help pioneering entrepreneurs turn their most innovative Internet and high technology products and services into successful companies. Cenetec enabled a number of early stage companies to effectively transform themselves into revenue producing enterprises. Cenetec currently holds positions in a number of such companies.

## CO-FOUNDER, RISK METRICS CORPORATION
BOCA RATON, FLORIDA - 1998 to 1999

Co-founded this information company in 1998. Risk Metrics gathers and sells public data to a wide range of customers. Mr. Hager recently sold his shares in Risk Metrics and no longer holds a position in the Company.

## PRESIDENT AND CHIEF EXECUTIVE OFFICER, NCCI, INC.
BOCA RATON, FLORIDA - 1990 to 1998

Mr. Hager was appointed President and CEO of the National Council on Compensation Insurance (NCCI) in May 1990. NCCI is the nation's largest workers' compensation and health care informatics corporation. Headquartered in Boca Raton, Florida, the corporation provides rate making services, database products, software, publications and consultation services to state funds, self-insureds, independent bureaus, agents, regulatory authorities, legislatures and more than 700 insurance companies. While under Mr. Hager's leadership, NCCI had annual revenues approaching $150 million, NCCI employed 1,000 people located in 20 offices around the United States and was and is the licensed statistical and rate advisory organization in nearly 40 states. During Hager's leadership, NCCI had annual pricing responsibility for some $16 billion of workers' compensation premium and responsibility to gain regulatory approval of that pricing.

During Hager's tenure, NCCI doubled revenues (from $70 million to $150 million), reduced loss cost inadequacy to nearly zero (down from 25% inadequacy), brought residual markets to an underwriting break-even point (down from $2 billion in annual underwriting losses) and provided the intellectual foundation for $1.5 billion in statutory reform. Concurrently, the organization was right-sized (head count reduced from 1,500 to 1,000), firepower was substantially increased (technical and professionals increased from 40% to 85% of the employment base), and the organization was converted from a rate bureau to a contemporary, competitive information company.

Specific expert skills that emanate from this position include:

Reported to a Board of Directors consisting of the lead insurance industry CEOs;

Oversaw an actuarial department with 150 employees;

Directed rate filings totaling about $100 billion of premium consisting of about 500 complex rate filings; as such, Mr. Hager is very familiar with the rate making process, the strategy relating to filings and the organizational intent of all rate making organizations;

Intensive management of the federal antitrust exposure of NCCI. As an organization that lawfully promulgated rates on behalf of competitors, this exposure was intensive and pervasive;

Positioned to provide pivotal strategic guidance and testimony as to resistance to a proposed rate filing or its approval. Working with a former NCCI FCAS, we are able to zero in on the relevant features of these rate filings;

Positioned to provide expert testimony as to whether an insurer's behavior conforms or fails to conform to industry practices; Damages, including punitive damages as appropriate, regarding workers' compensation insurers; and RICO matters.

## INSURANCE COMMISSIONER, STATE OF IOWA
DES MOINES, IOWA - 1986 to 1990

As Insurance Commissioner appointed by Governor Terry Branstad in July 1986, Mr. Hager was responsible for the regulatory oversight of all insurance companies, agents and brokers authorized to conduct business in the state of Iowa. He directed departments responsible for solvency oversight, consumer protection, agency licensing, and the administration of property and casualty, life and health insurance industries. In addition, Mr. Hager oversaw state regulation of the securities industry with Iowa's Supervisor of Securities reporting directly to him.

Mr. Hager brought contemporary technology to the Insurance Division. He pushed for aggressive legislation resulting in increased prosecution of agents and companies. For example, in 1986, $16 million was recovered from insurers for Iowa consumers. Under his direction, the division spearheaded an effort to attract new insurance operations to Iowa. Under this program, 3,000 new insurance jobs were added in 1988 alone. The program continues to date and is nationally recognized as a model of a constructive environment for attracting insurer operations. He was also responsible for implementing an assertive senior citizens advocacy program to educate the elderly on insurance purchases. Mr. Hager also strengthened rate oversight by leading the effort to hire an FCAS within the Department. Under Hager's leadership the FCAS was paid substantially more than Hager and even more than the Governor of the State.

The most important and yet least visible regulatory tool for an insurance commissioner is regulating for solvency. Mr. Hager was recognized for tenacious solvency regulation. During his term, several preexisting insolvencies were brought to completion and closed out. Furthermore, a number of marginal domestic insurers were declared insolvent and liquidated. Mr. Hager also facilitated a preemptive sale of a $4 billion Iowa domestic insurance company (Integrated Resources Life Insurance Co.) when its parent teetered on insolvency. The department worked with the insurer when a "run on the bank" was imminent and led a rapid sale of the insurer preempting a probable major insolvency. Under the terms of the sale all policyholders were made whole.

The department also recommended and supported state and federal prosecution of several insurance executives (e.g., American Excel) who committed financial fraud.

Specific expert skills that emanate from this position include:

- Responsible for oversight, interpretation and application of entire Iowa insurance code, which is analogous to most states;

- Interpretation and application of insurance laws and regulations to specific fact settings on a daily basis;

- Functioned frequently as an APA Hearing Officer, f/k/a hearing officer, applying insurance law to specific contested facts and rendering scores of written opinions. Topics included rate proposals for workers' comp, property/casualty, life and health; agents and insurer license revocations; unfair trade practice matters; and declaration of insolvencies;

- Working familiarity with SAP (vs. GAAP);

- Merger/acquisition approvals;

- Examination process; and

- Reinsurance/ Bulk Reinsurance approvals.

## NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS (NAIC)
1986 to 1990

Concurrent with his service as Iowa Insurance Commissioner, Mr. Hager served as a member of the NAIC. The NAIC is an organization of the insurance commissioners of all 50 states and meets regularly in locations throughout the U.S. to consider and evaluate national insurance issues. The NAIC considers all major insurance issues and formulates responsive model insurance laws and regulations, which are then routinely (but optionally) adopted at the individual state level. In addition, the NAIC promulgates and updates the key insurer financial reporting format, namely the NAIC Annual Statement Blank. The organization is based in Kansas City, Missouri and is staffed by well over 100 personnel.

**NAIC Chairmanships – Chairman of the Midwest Zone.** Mr. Hager was elected by his fellow Insurance Commissioners from the Midwest Zone (composed of the Midwest states, constituting about one quarter of all of the states) to provide leadership and representation of the Midwest before the balance of the states. This position included a position on the Executive Committee of the NAIC as well as major responsibilities relating to the assignment of states (and their related examiners) to specific examinations, both triennial and Market Conduct.

**NAIC Leadership: Member of the Executive Committee.** Mr. Hager also served as an elected member of the Executive Committee of the NAIC, the body that served as the steering committee of the organization, providing leadership between full membership meetings and providing recommendations to the full membership as to complex or politically charged issues within the organization.

**NAIC Chairmanships – Chairman of the Life Insurance Committee.** As a member of the NAIC, Mr. Hager served as both Vice Chairman and Chairman of the NAIC Life Insurance Committee. The charge of this Committee was oversight over all issues relating to life insurance products (including illustrations) as well as life insurers. This position and my four years of service at the NAIC exposed me to Mr. Hager to all aspects of life insurer operations and responsibilities.

**NAIC Chairmanships: Chair of the Universal Life Insurance Task Force**. In addition to chairing the Life Insurance Committee, Mr. Hager also chaired the Universal Life Insurance Task Force. The responsibility of this Committee included oversight of emerging life insurance products such as universal life.

**NAIC Chairmanships: Chair of the Life Insurance Product Development Task Force**. Mr. Hager also chaired the Life Insurance Product Development Task Force. While chairman of this task force, he led the development of model disclosure statements for universal and indeterminate premium life products designed to assist consumers in their comparison of different types of interest sensitive life insurance products, after a survey of the states determined regulatory problems existed with these products.

**NAIC Chairmanships Chair of the Financial Services and Insurance Regulation Task Force.** Mr. Hager also served as Chair of the Financial Services and Insurance Regulation Task Force and Member of the Executive Committee. Working with the other U.S. financial industries, this Task Force had responsibility to reconcile issues relating to non-insurance financial matters (e.g., banking and securities) in their intersection with insurance and insurance regulation.

**NAIC** – Other Committees. In addition, he also served on the following NAIC committees:

- Member, the Blanks Committee
- Member, Guarantee Fund Committee
- Member, Rehabilitator and Liquidators Committee
- Member, Casualty Actuarial Committee
- Member, Commercial Lines Committee
- Member, Valuation of Securities Committee,
- Member, International Insurance Relations Committee  • Member, Accounting Practices and Procedures Committee and
- Member, State and Federal Legislative Committee.

Specific expert skills in regard to NAIC include:
- Eight years of direct hands on experience at the NAIC as a regulator;
- Very familiar with the NAIC mechanisms;
- Conversant with and adept at applying NAIC publications to litigation (e.g., Examination Manuals; Liquidation Manuals; Accounting Manuals; SVO Office, etc.); and
- Working with recognized regulatory focused CPA's, Mr. Hager is able to provide specific and finite insurance/liquidation accounting expert testimony.

**Ongoing Regulatory Involvement.** In the years since leaving the regulatory ranks, Mr. Hager has continued to be closely involved with the NAIC and the regulatory community. As President and CEO of NCCI, he was in regular attendance at meetings of the NAIC and continues to currently attend these meetings and to be actively engaged with the regulatory process.


## PRACTICING ATTORNEY, HAGER & SCHACHTERLE
DES MOINES, IOWA - 1983 to 1986

Following his time in Washington, D.C., Mr. Hager returned to Des Moines and opened his own law firm in 1983. The firm specialized in corporate insurance, regulatory insurance and employee benefit matters. The firm also provided general legal services. Mr. Hager represented numerous clients (companies and agents) in regulatory matters before the Iowa Insurance Department. Representative matters included:

- Policy forms approval
- Rate approval
- Insurer disciplinary matters
- Agent disciplinary matters, and
- Insurer merger acquisition and holding company matters

Mr. Hager also lobbied on behalf of insurers at the state legislature and NAIC level. Representative clients included the:

- Property Casualty Insurance Association of America (PCIAA)
- The Iowa Professional Insurance Agents Association (PIA)
- Iowa Association of Life Underwriters (IALU)


## GENERAL COUNSEL AND DIRECTOR OF GOVERNMENT RELATIONS
## AMERICAN ACADEMY OF ACTUARIES
WASHINGTON, D.C. - 1980 to 1983

Mr. Hager served as General Counsel and Director of Government Relations for all Academy activities, including advising on admissions, discipline, federal antitrust and general corporate law. He represented the 20,000-member organization before Congress (e.g., Senate Committees on Banking, Commerce, Finance and Labor, and House committees on Education, Labor, Energy, and Ways and Means). He also represented the Academy before federal regulatory agencies, including the:

- Pension Benefit Guaranty Corporation
- Health Care Financing Administration, and
- The United States Department of Labor
- His additional duties included daily monitoring and reporting of all Congressional and regulatory activities affecting the profession.

While at the Academy Mr. Hager was also chief staff support to the following Academy Committees/functions:

• Committee on Discipline
• Committee on Risk Classification
• Committee on Guides to Professional Conduct
• And several others

Actuarial Standards Board.  Mr. Hager worked with Academy committees that subsequently provided the impetus for the creation of a national actuarial standards board that later became the Actuarial Standards Board (ASB).  See below.

Specific expert skills in this position include:

• Author of "The Emerging Law of Actuarial Malpractice"
• Working knowledge of Actuarial Professional Standards, including conversance with the pronouncements of the Actuarial Standards Board
• Adherence of the particular work product (or professional ethics) to  actuarial professional standards
• Applicable expert conclusions
• Knowledge of the organization and structure of the actuarial profession; the  profession's players; and the interaction of actuarial science and insurance
• Ability to optimize actuarial malpractice and rate proposal cases ○ Cross examination assistance of opposing actuarial experts  ○ Expert testimony as to standards (work product and ethics)

**ACTUARIAL STANDARDS BOARD (ASB)**
WASHINGTON D.C. - 1980 to 1983

As stated, concurrent with his service at the American Academy of Actuaries, Mr. Hager served as lead counsel to the Interim Actuarial Standards Board, the forerunner of the Actuarial Standards Board.  This Board promulgates the professional standards that come to hear the actuary's professional work product, including professional demeanor.  It parallels actuarially, the Financial Accounting Standards Board (FASB) as it relates to the accounting profession.

**CHIEF OF STAFF AT THE UNITED STATES CONGRESS**
**U.S. HOUSE OF REPRESENTATIVES**
WASHINGTON, D.C. - 1979 to 1980

Mr. Hager served as Chief of Staff, f/k/a Administrative Assistant, in Washington D.C. to Iowa Congressman Tom Tauke (Republican from Dubuque) for one year. His duties included the following:

• Coordinated district operations from Washington, D.C.
• Supervised office accounts

- Supervised district grant applications, and
- Managed a staff of 14

**CHIEF DEPUTY  (FIRST DEPUTY COMMISSIONER), IOWA INSURANCE DEPARTMENT**
DES MOINES, IOWA - 1976 TO 1978

Reported directly to Commissioner Herb Anderson. Mr. Hager supervised the following divisions within the Department:

**Life and Health Division.** The Life and Health Division was responsible for oversight of all life and health policy forms approvals as submitted by insurers. Additionally, this division was also responsibility for all related Life/Health rate change proposals.

**Property Casualty Division.** The Property Casualty Division was responsible of oversight of all property casualty policy forms approvals as submitted by insurers. Additionally, this division was responsible for all related property/casualty rate change proposals.

**Complaints Division.** This division was responsible for the processing and oversight of all consumer complaints received by the Insurance Department. In the Department's resolution of such complaints and where patterns of insurer and agent wrongdoing arose, to prosecute the insurers/agents under the Iowa Administrative Procedures Act. Mr. Hager personally led the Administration Prosecution of scores of such cases.

**Agents Licensing Division.** This application was responsible for overseeing all agent-licensing applications.

**Examination Division.**  Hager's duties included that of oversight of the examination division in connection with insurer annual statement filings and audits and solvency matters.

In addition to the above, Mr. Hager supervised initiation of formal administrative actions relating to departmental rules, companies (i.e., mergers, holding company activities and disciplinary activity), and agents (i.e., disciplinary).

**ADMINISTRATIVE LAW JUDGE, F/K/A HEARING OFFICER**
Hager served as an administrative law judge (ALJ), f/k/a Hearing Officer for the Iowa Department of Insurance.  This position, upon appointment by the Commissioner of Insurance entailed entering Orders and Decisions as to the usual procedural matters that arose – pre-hearing. Next the position entailed conducting the administrative hearings and entering decisions and orders as to hearing matters including issues of evidentiary and procedural rulings.  Post hearing, the position entailed entering findings of facts and conclusions of law and orders. Hager served as an ALJ during his years with the Iowa Department of Insurance.

**IOWA ASSISTANT ATTORNEY GENERAL**
DES MOINES, IOWA - 1975 TO 1976

Assigned to the Department of Insurance, serving as the Department's General Counsel. In that capacity, he:

·        Represented the Department in all state and federal litigation;
·        Prepared briefs for the Department's use in agency administrative hearing
·        Provided day-to-day legal guidance to the Commissioner as to all relevant matters
·        Prepared and issued Attorney General Opinions relative to insurance matters
·        Interpreted state insurance law and regulations
·        Prosecutor for APA hearings on behalf of the Insurance Department

**LEGAL COUNSEL TO THE REPUBLICANS, IOWA HOUSE OF REPRESENTATIVES**
DES MOINES, IOWA - 1975 SESSION

Retained by the Republicans of the Iowa House of Representative as their legal counsel for 1975 Session. In this position, Mr. Hager provided legal counsel on all relevant caucus issues and provided the following staff support:

·        Researched pending legislation
·        Prepared memorandums in support of proposed legislation
·        Provided legal advice
·        Participated in bill drafting
·        Worked the floor of the legislature as to specific legislation

**MATHEMATICS TEACHER, KALAKAUA INTERMEDIATE SCHOOL**
KALIHI DISTRICT, HONOLULU HAWAII - 1970-1972

Taught junior high mathematics and Hawaiian history in a school with a significant population of Hawaiian students during academic years 1970-71 and 1971-72.

**EDUCATIONAL BACKGROUND**

·        University of Northern Iowa, Cedar Falls, Iowa
         Bachelor of Arts degree, Secondary Mathematics Education, 1969
·        University of Hawaii, Honolulu, Hawaii
         Master of Education Degree, Educational Psychology, 1972
·        University of Illinois, Champaign, Illinois
         Juris Doctor, 1974

**BAR ADMISSIONS AND OTHERS**

11

Florida, by exam 2004;
Illinois, by exam 1975 (this license is currently in inactive status and is eligible for reactivation at any time at my volitions – this is so because I am and remain in good standing with the Illinois Bar);
Iowa, by exam 1975;
United States Supreme Court 1978

Member, South County Bar Association, Palm Beach County and Member of several of its Committees, including:

- ADR/Mediation;
- Corporate and Business, and;
- Civil Practice

Member of the Florida Bar and Member of the following Sections or Committees:[1]

- Health Law
- Administrative Law
- Workers Compensation Law.

## COMMUNITY

- Past Member of the Board and Past Vice Chairman of the Board, Boca Raton Regional Hospital
- Co-Chairman of the 2001 American Cancer Society's Ball (Boca Raton)
- Ball Chairman 1999 Boca Raton Community Hospital
- Ball Co-Chair of the 1998 Boca Raton Historical Society Ball
- Ball Chair of the 1997 American Heart Association Ball
- Board of Directors, National Conference of Christians and Jews of Southeast Florida
- Board Member, past Chair, Boca Raton Chamber of Commerce
- Member of the Session and current Stewardship Campaign Chairman, First Presbyterian Church (Delray Beach)
- Past Board Member, Past Chair, Florida Atlantic University Executive Advisory Board, College of Business
- Past Board Member, Past Campaign Chair, United Way of Palm Beach County
- Past Chair, March of Dimes Walk America
- Advisory Committee to the Board: Pinecrest School, Fort Lauderdale, Florida

## AWARDS

- Sun Sentinel Excalibur Award for Business Leaders in South Florida (awarded for excellent business practices)

---

[1] Committee and section membership varies from year to year with each bar membership.

- Silver Medallion Award, National Conference of Christians and Jews (awarded for ecumenical work in the community between all ethnic groups)
- Business of the Year (to NCCI), 1996 as CEO
- Many awards for work as Deputy Mayor and Elected Member of the Boca Raton City Council for seven years;
- Many awards for work as an Elected Member of the Florida House of Representatives for eight years;
- Others

## PROFESSIONAL

- Elected Councilman and Deputy Mayor of the City of Boca Raton; term ran from 2002 through 2009.
- Elected Member of the Florida House of Representatives: 2010 – 2018.

## AUTHOR

- Numerous Iowa Attorney General Opinions (1975-76)
- Antitrust Guide, American Academy of Actuaries (1982)
- Numerous other articles in various publications while General Counsel and Director of Government Relations to the American Academy of Actuaries (1980-1983)
- Numerous articles in various publications while Iowa Commissioner of Insurance (1986-1990)
- Author (and lecturer) of the Insurance Course of the Iowa Bar Review (1985- 1991)
- Numerous Hearing Officer Decisions under the Iowa Administrative Procedures Act (1978-1980; 1986-1990)
- Numerous articles about the US Workers Compensation System while President and CEO of NCCI (1990-1997)
- Law Review Article: William D. Hager, ***"The Authority of the States over Debtor Coercion by the Federal Savings and Loan Associations,"*** 27 Drake Law Review 651 (1977)
- Law Review Article: William D. Hager and Paul Noel-Chretien, ***"The Emerging Law of Actuarial Malpractice,"*** 31 Drake L.Rev. 831 (1982)
- Law Review Article: William D. Hager & Larry Zimpleman, ***"The Norris Decision, Its Implications and Applications,"*** 32 Drake L. Rev. 913 (1983)
- Numerous other articles

## PRESENTATIONS

- Numerous presentations to various groups while Iowa Assistant Attorney General
- Numerous presentations to various groups while Iowa First Deputy Insurance Commissioner

- Numerous presentations to various actuarial organizations/programs while General Counsel and Director of Government Relations of the American Academy of Actuaries
- Numerous presentations to various groups/organizations while a practicing attorney in Des Moines
- Numerous presentations to various groups while Commissioner of Insurance
- Numerous presentations to various groups while President and CEO of NCCI
- Numerous presentations to the high technology community in recent positions
- Numerous presentations before the Florida House of Representatives and its various committees from 2010 to 2018.

**PERSONAL**

Bill resides in Boca Raton and is the proud father of two daughters, both graduates of the University of Florida (Go Gators!!). Bill is a highly marginal golfer, and he has taught Sunday School at the First Presbyterian Church in Delray Beach, where he has also served as an Elder.

**CONTACT INFORMATION**

*Primary Office*
William D. Hager
President
Insurance Metrics Corporation
301 Yamato Road, Suite 1240
(aka NE 51st Street, Suite 1240)
Boca Raton, Florida 33431
T: (561) 306-5072
F: (561) 431-0596
E: bhager@expertinsurancewitness.com

*Miami Area Office*
William D. Hager
Insurance Metrics Corporation
2525 Ponce de Leon Boulevard, Suite 300
Coral Gables, Florida  33134
T: (561) 306-5072
F: (561) 431-0596
E: bhager@expertinsurancewitness.com

*Summer Office*
William D. Hager
Insurance Metrics Corporation
43328 Bills Beach Road
Dent, Minnesota 56528
T: (561) 306-5072
F: (561) 431-0596

E: bhager@expertinsurancewitness.com


Websites
Expert Insurance Witness
https://www.expertinsurancewitness.com

Workers' Compensation Expert
https://www.comppremiumwizards.com

Reinsurance Arbitrator
https://www.insurance-metrics.com
https://arias-us.org



**END OF THIS DOCUMENT.**

APPENDIX B

WILLIAM HAGER - PUBLICATIONS

| | |
|---|---|
| **William D. Hager** | 301 Yamato Road, Suite 1240 |
| Founder | Boca Raton, FL 33431 |
| Insurance Metrics Corporation | 561.306.5072 |
| https://www.expertinsurancewitness.com | bhager@expertinsurancewitness.com |

## Representative Articles and Speeches of William D. Hager

I have given many speeches and written numerous articles. Set out below is a representative sample of his articles and speeches.

## Law Review Articles

1. William D. Hager & Paul-Noel Chretien, "The Emerging Law of Actuarial Malpractice," 31 *DRAKE L. REV*. 831 (1982).

2. William D. Hager & Larry Zimpleman, The Norris Decision, Its Implications and Application, 32 *DRAKE L. REV*. 913 (1983).

3. William D. Hager, The Authority of the States Over Debtor Coercion By the Federal Savings and Loan Associations, 27 *DRAKE L. REV*. 651 (1977).

4. William D. Hager & James G. Leach, An Unsolicited Addition to the Wachtell, Lipton Takeover Response Checklist: The Merger of Revlon and McCarran-Ferguson, 41 *Federation of Insurance & Corporate Counsel* 189 (1991).

## Amicus Curiae Brief

5. Brief of Amicus Curiae American Academy of Actuaries, ***Arizona Governing Comm. v. Norris***, 463 U.S. 1073 (1983)(No. 82-52).

6. William D. Hager, Actuarial Malpractice - The Emerging Law and Growing Exposure, 32 Conf. of Actuaries in Pub. Prac. Proc. 480 (1982).

7. William D. Hager, The Emerging Law of Actuarial Malpractice, 32 Conf. of Actuaries in Pub. Prac. Proc. 496 (1982).

8. William D. Hager, Actuarial Liability, 35 Conf. of Actuaries in Pub. Prac. Proc. 627 (1985).

9. William D. Hager, The Emerging Law of Actuarial Malpractice, 35 Conf. of Actuaries in Pub. Prac. Proc. 643 (1985).

10. William D. Hager, The Workers' Compensation Crisis, 41 Conf. of Consulting Actuaries 351 (1992).

2

**Periodical Articles**

12. William D. Hager, Three Questions Regarding Enjoining Operations of RRGs and PGs, *Risk Retention Rep.*, Sept. 1989 at 155.

13. William D. Hager, Breathe Life Into Safety Education Programs, *The Bus. J. of Jacksonville*, Oct. 21, 1996.

15. William D. Hager, Prepare Employees For Overseas Travel Risks, *The Bus. J. of Jacksonville*, Oct. 25, 1996.

16. William D. Hager, States Provide Incentives for Drug Free Workplaces: Workers Comp Offers Discounts, *Cincinnati Bus. Courier*, May 9, 1997.

17. William D. Hager, Return to Work Programs, *Rough Notes Rep*.

18. William D. Hager, Stress Busters Designed to Relieve On the Job Burnout, *Rough Notes Rep.*

19. William D. Hager, Quality Process in the Workplace, *Rough Notes Rep*.

20. William D. Hager, Modifying the Workplace to Eliminate Repetitive Stress Syndrome, *Rough Notes Rep*.

21. Megan Santosus, Cross Purposes, *CIO Mag*., Nov. 1, 1994 (chronicling the technological transition Hager led while President of Nat'l. Council Comp. Ins. (NCCI), Boca Raton, Fla.).

22. William D. Hager, Lifting Awareness on Experience Ratings, *PRSIM Points* (WCSIT and ISDA, Springfield, Ill.), Spring / Summer 1996.

23. William D. Hager, NCCI States Its Case, *Indep. Agents Mag*., May, 1994.

24. William D. Hager, Introduction to Bruce N. Barge and John G. Carlson, the Executive's Guide to Controlling Health Care and Disability Costs (1993).

**Speeches**

25. William D. Hager, Perspectives of the Nineties, Address at Connecticut Insurance Day (Apr. 4, 1995).

26. William D. Hager, The State of Workers Compensation, Address at the American Association of State Compensation Insurance Funds Conference (Aug. 1993).

27. William D. Hager, The State of Workers Compensation, Address Before the Minnesota Chapter of the Chartered Property Casualty Underwriters Society (Nov. 4, 1993).

28. William D. Hager, Major Workers Compensation, Address Before the Chartered Property Casualty Underwriters Society (Nov. 8, 1995).

29. William D. Hager, Workers Compensation Fraud, Address at the American Risk and Insurance Association Annual Meeting (Aug. 11, 1997).

30. William D. Hager, Cycles in Workers Comp, Address at the American Association of State Compensation Insurance Funds Annual Conference (Aug. 18, 1997).

31. William D. Hager, NCCI: Enhanced Products and Services, Address at the Annual Corporate Advisory Board of the PMA Insurance Group (May 2, 1997).

32. William D. Hager, The State of Workers Compensation, Address at the Independent Insurance Agents of Iowa Convention (May 15, 1997).

33. William D. Hager, The Future of Rating Bureaus, Address at the Casualty Actuarial Society Spring Meeting (May 19, 1997).

34. William D. Hager, The State of Workers Compensation, Address Before the Maryland Workers Compensation Educational Association (Sept. 15, 1997).

35. William D. Hager, The Future of Workers Compensation, Annual Address at the Meeting and Annual Issues Symposium of NCCI (1991-1997).

36. William D. Hager, What State Departments of Insurance Should Expect from Casualty Loss Reserve Specialists. 1987 Casualty Loss Reserve Seminar.

37. William D. Hager, The Unfair Claims Practices Act – Sword and Shield; The Corporate Compliance and Executive Planning Super Conference - Governance: Sarbanes-Oxley and Beyond; (September 4, 2003).

38. William D. Hager, Actuarial Malpractice; The Conference of Consulting Actuaries; (November 3, 2003)

39. William D. Hager, Contributor and Periodic Guest as to Insurance Issues: the Nationally Syndicated Weekly Radio Show: It's Your Money with host Bill Bailey (2003).

**A.  2011 Legislative Session Presentations.**

Presentation to the House Insurance and Banking Committee;
Presentation to the House Regulatory Affairs Committee;
Presentation on the House Floor;
Surplus Lines Law Revisions  - proposed legislation;
2011 Session, Florida House of Representatives;

Presentation on the House Floor;

Modernization of the Florida Insurance Agents and Adjusters Laws  - proposed legislation;

Presentation to the House Insurance and Banking Committee;
Reform of the Catastrophic Reinsurance Fund ("CAT") - proposed legislation;
2011 Session, Florida House of Representatives;

**B.  2012 Legislative Session Presentations.**

Presentations to the House Insurance and Banking Committee;
Presentations to the House Regulatory Affairs Committee;
Presentations on the House Floor;
Reform of the Catastrophic Reinsurance Fund ("CAT") - proposed legislation;
2012 Session, Florida House of Representatives;

**C.  2013 Legislative Session Presentations.**

Presentation to the House Insurance and Banking Committee;
Presentation to the House Regulatory Affairs Committee;
Presentation on the House Floor;
Workers Compensation High Deductible - proposed legislation;
2013 Session, Florida House of Representatives;

Presentation to the House Insurance and Banking Committee;
Presentation to the House Regulatory Affairs Committee;
Presentation on the House Floor;
Modernization of the Florida Workers Compensation law – proposed legislation;
2013 Session, Florida House of Representatives;

Presentation to the House Insurance and Banking Committee;
Presentation to the House Regulatory Affairs Committee;
Presentation on the House Floor;
Reform of the Catastrophic Reinsurance Fund ("CAT") - proposed legislation;
2013 Session, Florida House of Representatives;

**D. Other 2013 Presentations**

 "Securing Florida's Property Insurance Future"
Insurance Day Summit Bermuda 2013 Annual Conference
June 25-26, 2013
Hamilton, Bermuda

"Florida's 2013 Legislative Session and Florida's Future Insurance Market"
Florida Insurance Council 2013 Summer Symposium
June 9-11, 2013
Fort Lauderdale, Florida

"How the Florida Legislature is Building Infrastructure to Assure Optimum Out-Year Commerce"
Economic Council of Palm Beach County, Board of Directors Meeting
June 12, 2013
Boca Raton, Florida;

Presentation to the House Insurance and Banking Committee;
Presentation to the House Regulatory Affairs Committee;
Presentation on the House Floor;
Various items of legislation;
2013 Session, Florida House of Representatives;

**E.  2014 Presentations.**

Participation in the Florida Chamber of Commerce's
Legislative Pre-Session Panel on Insurance;

Presentation to the House Insurance and Banking Committee;
Presentation to the House Regulatory Affairs Committee;
Presentation on the House Floor;
Various items of legislation;
2014 Session, Florida House of Representatives;

Presentation to the Florida Insurance Counsel:
"State of Affairs of the Florida Insurance Marketplace"
November 2014

**F.  2015 Presentations;**

Moderated the panel on Worker's Compensation Insurance,
State of the Florida Insurance Marketplace;
January, 2015;

Participated on the legislative panel Florida Chamber of Commerce
Annual pre-legislative seminar;
January, 2015

Presentation to the House Insurance and Banking Committee;
Presentation to the House Government Operations Appropriations Committee;
Presentation to the House Regulatory Affairs Committee; Funding the Florida Catastrophic
Storm Risk Management Center at Florida State University for research and mitigation purposes;

Presentation to the House Insurance and Banking Committee;
Presentation to the House Regulatory Affairs Committee;
Presentation on the House Floor;
Various items of legislation, including Uber and Title Insurance

2015 Session, Florida House of Representatives;

Lecturer at the Annual Florida State University College of Law Insurance Symposium on Regulatory and Legislative Matters, March 2015

Participated on the legislative panel Florida Chamber of Commerce
Annual pre-legislative seminar;
November, 2015

**G.  2016 Presentations.**

Lecturer at the Annual Florida State University College of Law
Insurance Symposium on Regulatory and Legislative Matters,
March 2016;

Presentation to the House Insurance and Banking Committee;
Presentation to the House Regulatory Affairs Committee;
Presentation on the House Floor;
Various items of legislation, including Title; Life Insurance and No Fault Auto
2016 Session, Florida House of Representatives;

**H.  2017 Presentations.**

Lecturer at the College of Law; Florida State University;
Insurance Symposium on Regulatory and Legislative Matters,
March 2017;

Lecturer at the Palm Beach County CPCU Society;
Topic: 2017 Florida Legislature Insurance Issues;

2017 Session: Florida House of Representatives
Presentations and Debate on Insurance Issues before the House Commerce Committee;
Presentations to the House Regulatory Affairs Committee;
Presentations and Debate on Insurance Issues before the entire House of Representatives;
Various items of legislation, as sponsor and co-sponsor, including No Fault Auto; Workers
Compensation Reform;  Drug Houses and Opium Overdoses;

2017 (November): Presenter, FAU's Veteran's Entrepreneurship Seminar

2017 (November): Presentation to the Boca Chamber of Commerce's Political Action
Committee;

**I.  2018 Legislative Session Presentations.**

Presentation to the House Insurance and Banking Committee;

Presentation to the House Regulatory Affairs Committee;
Presentation on the House Floor;
Various Items of Legislation

**Risk Retention Litigation**

40. ***Frontier Insurance Company, Inc. et al. v. William D. Hager, Commissioner of Insurance of the State of Iowa***, #F87-645-E (U.S. District Court for the Southern District of Iowa).

41. ***Swanco Insurance Company v. Hager***, 877 F.2d 353 (8th Cir. 1989), cert. Denied, 493 U.S. 1057, 110 S.Ct. 866, 107 L.Ed. 2d. 361 (11th Cir. 1990).

**END OF THIS DOCUMENT.**

**APPENDIX C**

**WILLIAM HAGER PRIOR TESTIMONY**

*ABW v. Republic Franklin Utica Insurance Company,* Connecticut Superior Court, Case UWY-CV-14-6025010-S, D 7/19, T 1/2020

*Addison v. Mepco,* Iowa District Court, Ft. Madison, Iowa, D T 7/2017

*Allstate v. Adams*, USDC, Western District Court of Missouri, Case 3:15-05121, D 1/17

*Almeria Park Codo Association v Empire Indemnity Ins. Co,* U.S. District Court, Southern District of Florida, D 11/19

*American K-9 v. Rutherford*, Circuit Court of Orange County, Florida, Case No. 2011-CA-7669, D 1/16

*Applied Underwriters v. Pitamber,* USDC, District of Nebraska, Case No. 8:17-cv-00061, D 6/19

*Baldwin v. Athene Life Ins. Co.,* State District Court, Polk County, Iowa, Case No. CVCV054026, D 1/19

*Bishop v. South Congregational Church, et al.,* Massachusetts Superior Court, Case No. 1776CV00037, D 1/2020

*Capital Wealth Advisors, LLC V CWA, Inc.*, 20th District Court, Collier County, Florida, Case No. 18-CA-0682, D 10/19

*Carithers v. Mid Continent*, USDC, Middle District of Florida, Case No. 3:16-cv-00988, D 11/18

*Charleston Diocese v. Century Indemnity*, USDC, South Carolina, Case No. 2:14-01289, D 7/16

*Diaz v. Banco Popular,* Commonwealth of P.R., Superior Court of Arecibo, Case No. CAC 2017-0014, D 8/19, D 10/19

*DCD v. Transamerica*, USDC, Central District of California, Case No. 2:15-cv-03238, D 7/17

*Dunlap, Thomas James v. AIG, Inc., et al.,* Iowa District Court for Polk County, Law No. LACL114516, D 2/21/2020

*Electric Power Sys v. Zurich*, USDC, Eastern District of Missouri, Case No. 15-01171, D 7/16

*Emerald Coast v. Sunrise Produce*, USDC Southern Mississippi Eastern Division, Case No. 2:14-cv-00166, D 3/16

*Forrest Maching vs. AUCRA,* Superior Court of California, Los Angeles, Case No. PC057844, T 11/19

2

*Hass v. Wilkerson*, Circuit Court, Thirteenth Judicial Circuit in and for Hillsborough County, Florida, Case No. 10-023913, T 8/16

*Herrera v. AAA Insurance*, In the Circuit Court of the County of Jackson, Kansas City, State of Missouri, Case No. 1516-CV24368, D 4/17

*In Re: Clarence DePass*, In the United States Bankruptcy Court for the Southern District of Florida, Case No. 14-37130, T 1/17

*JK Harrison v. Continental Western*, In the Iowa District Court in and for Polk County, LACL134978, D 10/17

*Laffaldo v. Sun West and Procter,* USDC, Southern District of Florida, T 2/18

*Latterner v. Transamerica Life Ins. Co.,* USDC, Southern District of Florida, Case No. 17-22662-CIV-Cooke, D 4/18

*Levine v. Continental*, USDC, District of Massachusetts, Case No. 1:14-11099, D 10/16

*McClendon v. North Carolina Mutual*, USDC for the Middle District of Tennessee, Nashville Division, Case No. 3:17-cv-00404, D 5/19

*Merriweather v. Anderson*, Circuit Court Duval County, Florida, Case No. 16-2012-CA-011944, D 3/15, T 11/15

*Mirfashihi v. Travelers,* Circuit Court of Jackson County, Missouri, T 3/18

*Moran v. ILU*, Circuit Court of Cook County, Illinois, Case No. 2013 L 13317, D 11/15

*Nelson v. Connor & Gallagher Ins.,* Circuit Court of Cook County, Illinois, Case No. 2011L000203, D 11/15

*Northend v. Southern Trust*, USDC for the Western District of Tennessee, Eastern Division, Case 1:16-cv-01137; D 5/17

*Northrup v. Wausau*, In the Circuit Court of Jackson County, Missouri, at Kansas City, Case No. 13:16-cv-27418, D 7/17,  T 11/17

*Nowak, Olga J., Irrevocable Trust v. Voya Financial, et al.,* Superior Court of Delaware, C.A. No. N17C-05-254; D 2/2020

*NYU v. FM Global,* USDC, Southern District of New York, D 3/18

*Ohio Security Ins. Co. v. Truck Tire Sales*, USDC, Northern District of Illinois, Case No. 1:16-cv-11045, D 4/19

*Pate Industrial v. Burrow Global Services, et al.,* District Court of Jefferson County, Texas, Case No. E-198-813, D 2/18/2020

*Poetsch v. GeoVera,* 17th Judicial Circuit of Florida, Case No. 15-018630(18), D 1/19, T 3/19

*Regency Cab v. Travelers*, In the Circuit Court for the County of Fairfax, Case No. 2015-0011335, D 10/17, T 11/17

*Roadrunner vs. AUCRA,* Superior Court of California, County of Ventura , Case No. 56-2017-00493391-CU-CO-VTA, T 10/19

*Salyer, et al. v. J.D. Carty Resources, et al.,* Commonwealth of Kentucky, Magoffin Circuit Court, Case No. 07-CI-00006, D 10/18, T 10/18

*Schmidt v. Northwestern*, USDC Oklahoma County, Oklahoma, Case No. CJ-2013-4090, D 7/15

*Smith v. Am Pioneer*, USDC Oklahoma County, Oklahoma, Case No. CJ-2014-6062, D 3/16

*Spring Social Club, Inc. v. Greenwood Ins.*, In the District Court of Harris County, Texas, Case No. 2015-46905, D 7/17 D

*Suarez v. Liberty Mutual*, Circuit Court of Miami-Dade County, Florida, Case No. 10-13100, D 6/15

*Sun Life Assurance Co. of Canada v. U.S. Bank, et al.,* USDC District of Delaware, Case No. 17-00075, T 5/19

*Timbervest v. Lanier*, Superior Court of Fulton County, Georgia, Case No. 2014-CV-24820, D 1/16

*Travelers v. Jet Midwest*; USDC Western District of Missouri, Case 5:16-06084, D 4/17, T 2/19

*U.S. v. Sklar*, USDC Northern District of Illinois, Case No. 10-5583, D 10/16

*Victaulic v American Home*, California State District Court for the County of Fresno, D 5/15, T 7/15

*Wells Fargo v. Commonwealth Land Title,* USDC, District of Nevada, Case No. 218-cv-00494-APG-PAL, D 1/19

*Western Heritage v. Morstan*, USDC District of Arizona, Case No. CV-14-023424, D 10/15

**APPENDIX D**
**DOCUMENTS REVIEWED BY WILLIAM HAGER**

**DOCUMENTS REVIEWED – UNITED FIRE v. PROGRESSIVE**

1. United Fire's Amended Complaint
2. Progressive's Answer and Affirmative Defenses
3. Expert Witness Report of Douglas McIntosh
4. Progressive's Rule 26(a)(2) Disclosure
5. UFG v. Progressive Order 6/15/20
6. UFG v. Progressive Order 5/28/20
7. Deposition 30(b)(6) of Progressive taken 6/18/20 and the Exhibits to same
8. Progressive documents and records
9. United Fire documents and records



**PROGRESSIVE**

Progressive Insurance Company
747 Alpha Drive
Highland Heights, OH 44143
Phone No: 440-603-6216
Fax No: 440-603-6316
mandy_hansen@progressive.com

Underwritten by: Progressive Express
Insurance Company
Policyholder: North Florida Diesel Inc.
Policy No:    02065108-0
Claim No:    14-5402474
Date of Loss:  November 13, 2013
1-800-PROGRESSIVE (1-800-776-4737)

*Rec 6-30-14*

By CERTIFIED and REGULAR MAIL

June 26, 2014

Great South Timber and Lumber
Po Box 2249
Lake City, FL 32056

To Whom It May Concern:

This letter is to provide you with an update concerning the status of a claim that potentially involves Great South Timber and Lumber LLC.

This claim arises from a two-vehicle accident that occurred at approximately 8:10 PM EST on November 13, 2013 in Columbia County, Florida, when a car driven by Pierce Mills in which his wife, Lois Mills, was a passenger, struck the right rear of a tractor-trailer being operated by NFD. The truck was being driven by Carl Therrel, who had spent the day moving loads of logs from logging sites to mills in North Florida and Georgia. He had delivered his last load and was returning home for the day when the accident occurred. The Lake City Police Department ticketed Therrel for failing to yield the right of way while turning left.

In the accident, Mrs. Mills sustained a severe neck injury that has rendered her a quadriplegic. She has been transferred from the hospital to a skilled nursing facility, where she is expected to remain for the balance of her life.

Mr. Mills sustained a broken leg and a broken arm; neither injury required surgery.

The Mills are currently represented by attorney Bob Kulik of Jacksonville.

On May 12, 2104, Progressive Express Insurance Company tendered the policy limit of the NFD policy ($500,000) to the Mills and requested they release North Florida Diesel, Inc., Carl Therrel, Therrel Transport, Julie Speirs, Stacy Norman and Great South Timber and Lumber for all claims they may have arising from the November 13, 2013 accident.

It is our understanding that the Mills are now considering accepting the Progressive tender for a release of North Florida Diesel, Carl Therrel, Therrel Transport, Julie Spires, and Stacy Norman only.

## Exhibit B

The Mills are also making a demand for the policy limits of the general liability, commercial auto, and umbrella insurance policies issued to Great South Timber and Lumber LLC by United Fire Group. We advised you of this in a letter which was sent to you on June 06, 2014.

Because the Mills' claims have a potential value in excess of the limits of the Progressive policy issued to NFD, Progressive wants to confirm Great South Timber and Lumber LLC has retained personal counsel to advise it regarding this loss. We sent a letter to you on June 06, 2104 inquiring whether Great South has retained personal counsel for this loss. To date, we have received no response from Great South in regards to this request.

We believe that it is in Great South's best interest to consult with an attorney on how Great South can protect itself from any personal exposure for any damages which may be awarded in excess of the available insurance coverage. I ask again that if Great South has retained personal counsel for this loss, that they have the attorney contact me.

If you have any further questions or would like to discuss this matter further, you can reach me at the contact information below.

Sincerely,

PROGRESSIVE EXPRESS INSURANCE COMPANY

*Mandy L. Hansen*

Mandy L. Hansen
Senior Casualty Specialist
Phone No:  440-603-6216
Fax No: 440-603-6316
E-mail:  mandy_hansen@progressive.com

MH/mm

*PROGRESSIVE*

Progressive Insurance Company
747 Alpha Drive
Highland Heights, OH 44143
Phone No:  440-603-6216
Fax No: 440-603-6316
mandy_hansen@progressive.com

Underwritten by: Progressive Express
Insurance Company
Policyholder: North Florida Diesel Inc.
Policy No:     02065108-0
Claim No:     14-5402474
Date of Loss: November 13, 2013
1-800-PROGRESSIVE (1-800-776-4737)

## By CERTIFIED and REGULAR MAIL

June 6, 2014

Great South Timber and Lumber
Po Box 2249
Lake City, FL 32056

To Whom It May Concern:

This letter is to provide you with an update concerning the status of a claim that
potentially involves Great South Timber and Lumber LLC.

This claim arises from a two-vehicle accident that occurred at approximately 8:10
PM EST on November 13, 2013 in Columbia County, Florida, when a car driven by
Pierce Mills, in which his wife was a passenger, struck the right rear of a tractor-
trailer being operated by NFD.   The truck was being driven by Carl Therrel, who
had spent the day moving loads of logs from logging sites to mills in North Florida
and Georgia. He had delivered his last load and was returning home for the day
when the accident occurred.   The Lake City Police Department ticketed Therrel for
failing to yield the right of way while turning left.

In the accident, Mrs. Mills sustained a severe neck injury that has rendered her a
quadriplegic. She has been transferred from the hospital to a skilled nursing facility,
where she is expected to remain for the balance of her life.

Mr. Mills sustained a broken leg and a broken arm; neither injury required surgery.

The Mills are currently represented by attorney Bob Kulik of Jacksonville.

On May 12, 2104, Progressive Express Insurance Company tendered the policy limit
of the NFD policy ($500,000) to the Mills and requested they release North Florida
Diesel, Inc., Carl Therrel, Therrel Transport, Julie Speirs and Great South Timber
and Lumber for all claims they may have arising from the November 13, 2013
accident.  I have enclosed a copy of the proposed release for your review.

It is our understanding that the Mills have not accepted the Progressive tender, and
are now making a demand for the policy limits of the general liability, commercial
auto, and umbrella insurance policies issued to Great South Timber and Lumber LLC
by United Fire Group.

GS Rsp to SDT 073

**Great South Lumber and Timber, LLC**
**June 6, 2014**
**Page 2**


Because the Mills' claims have a potential value in excess of the limits of the Progressive policy issued to NFD, Progressive wants to confirm Great South Timber and Lumber LLC has retained personal counsel to advise it regarding this loss.  If Great South does have personal counsel for this matter, please provide a copy of this letter to your personal attorney, and provide me with his/her name and contact information.

If you have any further questions or would like to discuss this matter further, you can reach me at the contact information below.

Sincerely,

PROGRESSIVE EXPRESS INSURANCE COMPANY
Mandy L. Hansen
Senior Casualty Specialist
Phone No:  440-603-6216
Fax No: 440-603-6316
E-mail:  mandy_hansen@progressive.com